Bryon J. Benevento (5254)
Dan R. Larsen (4865)
Chris Martinez (11152)
Snell & Wilmer L.L.P.
15 West South Temple, Suite 1200
Beneficial Tower
Salt Lake City, Utah  84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

Michael Einbinder (*Pro Hac Vice* to be filed)
Matthew David Brozik (*Pro Hac Vice* to be filed)
Einbinder & Dunn, LLP
104 W. 40th Street, 20th Fl.
New York, NY 10018
Telephone: (212) 391-9500
Facsimile: (212) 391-9025

**COPY**

*Attorneys for Plaintiffs*

## IN THE THIRD JUDICIAL DISTRICT COURT IN AND FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MARIPOSA EXPRESS, INC.; COLD SPRING INVESTMENTS, LLC; COLD SPRING INVESTMENTS #1, LIMITED PARTNERSHIP; COLD SPRING INVESTMENTS #2, LIMITED PARTNERSHIP; NEWBURYPORT CAPITAL, LLC; UNITED SHIPPING SOLUTIONS OF NY INC.; OUTFORCE, LLC; KBS LLC; UNITED SHIPPING SOLUTIONS LLC; M.K. LOGISTICS MANAGEMENT LLC; HANNAH ENTERPRISES, INC.; METRO MAR VENTURES LLC; BUCKEYE SHIPPING AND FREIGHT, INC.; MICHAEL JONES, LLC; USS O'BRIEN, INC.; USS HIGHLAND PARK, INC.; UNITED SHIPPING SOLUTIONS INC.; USS HOLDINGS, LLC, USS COLUMBIA, LLC; SHARON MCWILLIAMS; TEFAN TRIANDAFILOU; GREG CHRISTENSEN; | **COMPLAINT**<br><br>Case No. _____<br><br>Judge _____ |

STEVE LOWY; ERIC SWEENEY; JOHN
TOLBERT; ROBERT PLATSCHEK;
BRUCE M. MAZZOCHI; CHRIS
KULAWIK; ROBERT HARRIS; JASON
O'ROURKE; MIKE JONES;
JIM O'BRIEN; and WILLIAM DEMET,

                Plaintiffs,

- against -

UNITED SHIPPING SOLUTIONS, LLC;
and USS LOGISTICS, LLC,

                Defendants.

The plaintiffs, by their undersigned counsel, as and for their complaint against the defendants, allege as follows:

## PARTIES

1.      Plaintiff Mariposa Express, Inc. is a corporation existing by virtue of the laws of the State of California with a principal place of business at 4419 Little Brook Court, Fair Oaks, California 95628, whose principal is Sharon McWilliams.

2.      Plaintiff Cold Spring Investments, LLC is a limited liability company existing by virtue of the laws of the State of Maryland with a principal place of business at 15920 Tournament Drive, Gaithersburg, Maryland 20877, whose principal is Stefan Triandafilou.

3.      Plaintiff Cold Spring Investments #1, Limited Partnership is a limited partnership existing by virtue of the laws of the State of Maryland with a principal place of business at 15920 Tournament Drive, Gaithersburg, Maryland 20877, whose principal is Stefan Triandafilou.

4.      Plaintiff Cold Spring Investments #2, Limited Partnership is a limited partnership existing by virtue of the laws of the State of Maryland with a principal place of business at 15920 Tournament Drive, Gaithersburg, Maryland 20877, whose principal is Stefan Triandafilou.

5.      Plaintiff Newburyport Capital, LLC is a limited liability company existing by virtue of the laws of the State of Maryland with a principal place of business at 15920 Tournament Drive, Gaithersburg, Maryland 20877, whose principal is Stefan Triandafilou.

6.      Plaintiff United Shipping Solutions of NY INC. is a corporation existing by virtue of the laws of the State of New York with a principal place of business at 1467 40th Street, Brooklyn, New York 11218, whose principal is Steve Lowy.

7.      Plaintiff Outforce, LLC is a limited liability company existing by virtue of the laws of the State of Georgia with a principal place of business at 500 Northridge Road, Suite 140, Atlanta, Georgia 30350, whose principals are Eric Sweeney and John Tolbert.

8.      Plaintiff KBS LLC is a limited liability company existing by virtue of the laws of the State of Pennsylvania with a principal place of business at 599 Kimble Drive, Glenshaw, Pennsylvania 15116, whose principal is Bryan Smetanka.

9.      Plaintiff United Shipping Solutions LLC is a limited liability company existing by virtue of the laws of the State of Ohio with a principal place of business at 20575 Center Ridge Road, Suite 506, Cleveland, Ohio 44116, whose principal is Robert Platschek.

10.     Plaintiff M.K. Logistics Management LLC is a limited liability company existing by virtue of the laws of the State of Connecticut with a principal place of business at 2 Horseshoe Circle, Simsbury, Connecticut 06070, whose principals are Bruce M. Mazzochi and Chris Kulawik.

11.     Plaintiff Hannah Enterprises, Inc. is a corporation existing by virtue of the laws of the State of Massachusetts with a principal place of business at 76 Alexander Place, Westfield, Massachusetts 01085, whose principal is George Ammirato.

12.     Plaintiff Metro Mar Ventures LLC is a limited liability company existing by virtue of the laws of the State of Nevada with a principal place of business at 409 Apollo Beach Boulevard, Apollo Beach, Florida 33572, whose principal is Robert Harris.

13.     Plaintiff Buckeye Shipping and Freight, Inc. is a corporation existing by virtue of the laws of the State of Ohio with a principal place of business at 635 Park Meadow Road, Suite 215, Westerville, Ohio 43081, whose principal is Jason O'Rourke.

14.     Plaintiff Michael Jones, LLC is a limited liability company existing by virtue of the laws of the State of Virginia with a principal place of business at 5114 Greenwich Road, Virginia Beach, Virginia 23462, whose principal is Mike Jones.

15.     Plaintiff USS O'Brien, Inc. is a corporation existing by virtue of the laws of the State of Illinois with a principal place of business at 117 East Palatine, Suite 205, Palatine, Illinois 60067, whose principal is Jim O'Brien.

16.     Plaintiff USS Highland Park, Inc. is a corporation existing by virtue of the laws of the State of Illinois with a principal place of business at 117 East Palatine, Suite 205, Palatine, Illinois 60067, whose principal is Jim O'Brien.

17.     Plaintiff United Shipping Solutions Inc. is a corporation existing by virtue of the laws of the State of Illinois with a principal place of business at 6340 North Kedzie Avenue, Chicago, Illinois 60659, whose principal is Jacob Grunfeld.

18.     Plaintiff USS Holdings, LLC is a limited liability company existing by virtue of the laws of the State of South Carolina with a principal place of business at 110 Laurens Road, Greenville, South Carolina 29607, whose principal is William Demet.

19.     Plaintiff USS Columbia, LLC is a limited liability company existing by virtue of the laws of the State of South Carolina with a principal place of business at 110 Laurens Road, Greenville, South Carolina 29607, whose principal is William Demet.

20.     Each plaintiff individual executed and delivered to the defendants a guarantee of the obligations of one or more of the franchisee plaintiffs.

21.     Defendant United Shipping Solutions, LLC is a Utah limited liability company with a principal business address of 6985 Union Park Center, Suite 565, Salt Lake City, Utah 84047.

22.     Defendant USS Logistics, LLC is a Utah limited liability company with a principal business address of 6985 Union Park Center, Suite 565, Salt Lake City, Utah 84047.

23.     Upon information and belief, USS Logistics, LLC is a subsidiary or sister company of United Shipping Solutions, LLC, with common ownership and governance, and together will be referred to hereinafter as "USS."

### JURISDICTION AND VENUE

24.     Jurisdiction and venue are based on the principal place of business of USS.

### FIRST CAUSE OF ACTION
### (DECLARATORY RELIEF)

25.     USS is a reseller of transportation services primarily to small and medium-sized businesses.

26.     Each franchisee plaintiff entered into a written franchise agreement with USS, the terms of which agreements are identical or substantially similar. An exemplar franchise agreement is attached hereto as Exhibit A.

27.     The business of each franchisee of USS, and the purpose for which each franchisee plaintiff entered into a franchise agreement with USS, is to resell transportation services primarily to small and medium-sized businesses under the name "United Shipping Solutions."

28.     Each franchisee plaintiff's franchisee agreement provides, in pertinent part, that the franchisee is granted the right to resell the services of the transportation services business with whom USS has separately contracted.

29.     At the time of the execution of each franchisee plaintiff's franchise agreement, USS had an agreement with non-party DHL Express (USA), Inc. ("DHL") to resell that company's transportation services. Accordingly, each franchisee plaintiff entered into its franchise agreement(s) with USS expecting to resell DHL transportation services.

30.     To date, each franchisee plaintiff has been reselling the transportation services of DHL.

31.     DHL has notified USS, and USS has in turn notified the plaintiffs, that as of on or about December 10, 2008, DHL will "focus entirely on its international offerings and will discontinue its domestic-only air and ground services."

32.     The vast majority of the business of each franchisee plaintiff is reselling those services that DHL is canceling. Some franchisee plaintiffs' businesses consist entirely of reselling domestic shipping services.

33.     The inability to resell domestic shipping services would destroy each franchisee plaintiff's business.

34.     Under the "noncompetition" provisions of the franchise agreement—Section 21 thereof—each franchisee plaintiff is unable to contract independently with a transportation services business that offers services or products that are the same as or substantially similar to those that are or could be offered by USS.

35.     Each franchisee plaintiff is as a practical matter unable to contract with another franchisor reseller of transportation services—or the franchisees thereof—while it is bound by its franchise agreement with USS.

36.     The essential purpose of each franchisee plaintiff's franchise agreement has thus been frustrated and performance thereunder rendered impossible.

37.     The circumstance causing the frustration of purpose and impossibility of performance of the franchise agreements of the franchisee plaintiffs was not the result of any action or inaction of any plaintiff.

38.     Moreover, USS has begun to contact customers of the franchisee plaintiffs to request that they remit payment, for services arranged by the franchisee plaintiffs, to USS directly.

39.     Plaintiffs are therefore entitled to a declaratory judgment that immediately discharges them from all remaining obligations under their respective franchise agreement, including all post-termination obligations, and prohibits USS from contacting the plaintiffs' customers.

### SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT – TERMINATION OF AGREEMENT)

40.    Plaintiffs repeat the allegations contained in paragraphs 1 through 39, inclusive, above as if fully set forth herein.

41.    USS has an obligation to negotiate a contract containing substantially similar terms with another carrier if USS's principal carrier contract is terminated for any reason.

42.    Despite the termination of its contract with DHL, USS has not negotiated an equivalent or reasonably equivalent substitute contract.

43.    Upon information and belief, USS will not be able to negotiate an equivalent or reasonably equivalent substitute contract before December 10, 2008.

44.    Instead, USS has purportedly negotiated an agreement with FedEx Corporation, but the terms of the agreement are substantially less favorable than were the terms of USS's agreement with DHL and do not permit the franchisee plaintiffs to generate any new business.

45.    Thus, USS has expressed a positive and unequivocal intent not to render performance under the franchise agreements, constituting an anticipatory material breach of each franchisee plaintiff's franchise agreement by virtue of making it impossible for each plaintiff to perform under its franchise agreement and frustrating the essential purpose thereof.

46.    Each franchisee plaintiff is entitled, by virtue of USS's material breach, to treat its franchise agreement as terminated and accordingly immediately to consider all remaining obligations thereunder, including specifically all post-termination obligations, void.

### THIRD CAUSE OF ACTION
### (BREACH OF CONTRACT - REFORMATION)

47.     The plaintiffs repeat the allegations contained in paragraphs 1 through 46, inclusive, above as if fully set forth herein.

48.     Each plaintiff's franchise agreement expressly acknowledges the possibility, at Paragraph 26.1(i) thereof,  that USS's principal carrier contract might be terminated and that USS might be unable, even after a good faith effort, to negotiate a contract containing substantially similar terms with another carrier.

49.     Accordingly, the franchise agreement gives USS the unilateral right to terminate the franchise agreement and the franchise granted thereby.

50.     Notwithstanding that the provision is presented as a possible default of the franchisee, and moreover one that the franchisee would have no right to cure, such potentiality is not a default of the franchisee.

51.     The inclusion of Paragraph 26.1(i) in the franchise agreement is an acknowledgement that the circumstance described thereby would make performance of the franchise agreement impossible.

52.     Accordingly, it is inequitable that the right to terminate the franchise agreement under the circumstance described should be unilateral to USS.

53.     Plaintiffs are therefore entitled to reformation of their franchise agreements such that Paragraph 26.1(i) will provide both parties to each franchise agreement the right to terminate the agreement if USS is unable to negotiate a substitute transportation services contract in the event that its principal carrier contract is terminated.

### FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT - DAMAGES)

54.    Plaintiffs repeat the allegations contained in paragraphs 1 through 53, inclusive, above as if fully set forth herein.

55.    Each franchisee plaintiff has been damaged by USS's material breach of its franchise agreement in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT - CANCELLATION OF GUARANTEES)

56.    Plaintiffs repeat the allegations contained in paragraphs 1 through 55, inclusive, above as if fully set forth herein.

57.    Each individual plaintiff guarantor is entitled, by virtue of the foregoing, to cancellation of the guarantee given by him or her to USS.

**WHEREFORE** the plaintiffs demand judgment against defendants United Shipping Solutions, LLC and USS Logistics, LLC as follows:

a.    Declaring that each franchisee plaintiff's remaining obligations under its franchise agreement, including specifically all post-termination obligations, are discharged;

b.    Enjoining the defendants from contacting the plaintiffs' customers directly;

c.    Declaring that the defendants have materially breached each franchisee plaintiff's franchise agreement;

d.    Declaring that each plaintiff individual's guarantee is canceled and that all remaining obligations thereunder are discharged;

e.    Ordering that each franchisee plaintiff's franchise agreement be reformed to provide that both parties thereto have the right to terminate the agreement if United Shipping

Solutions, LLC is unable to negotiate a substitute transportation services contract in the event

that its principal carrier contract is terminated;

     f.     Awarding each franchisee plaintiff compensatory monetary damages in an

amount to be determined, but believed to range, among the franchisee plaintiffs, from $250,000

to $10,000,000.

     g.     Awarding each plaintiff the costs and disbursements of this action; and

     h.     Granting such further relief as the court deems just.

Dated this 3rd day of December, 2008.

                    Snell & Wilmer L.L.P.

                    Bryon J. Benevento
                    Dan R. Larsen
                    Chris Martinez

                    Michael Einbinder (*Pro Hac Vice* to be filed)
                    Matthew David Brozik (*Pro Hac Vice* to be filed)
                    Einbinder & Dunn, LLP
                    104 W. 40th Street, 20th Fl.
                    New York, NY 10018

                    *Attorneys for Plaintiffs*

Serve Defendants At:

United Shipping Solutions, LLC
6985 Union Park Center, Suite 565
Midvale, Utah 84047

Registered Agent:     RJC Investments, LLC
                    6985 Union Park Center, Suite 565
                    Midvale, Utah 84047

USS Logistics, LLC
6985 Union Park Center, Suite 565
Midvale, Utah 84047

Registered Agent:      RJC Investments, LLC
                       6985 Union Park Center, Suite 565
                       Midvale, Utah 84047

TONE STATIONERS, INC.
5 Greenwich Street
npstead, N.Y. 11550
5-9000 or (800) 632-2273

Exhibit A

FRANdata
FOR INTERNAL USE ONLY · NOT FOR RESALE

UNITED SHIPPING SOLUTIONS, LLC
FRANCHISE AGREEMENT

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

# TABLE OF CONTENTS

RECITALS ................................................................................................................3
1. GRANT OF FRANCHISE ..............................................................................4
2. DEVELOPMENT TERRITORY .....................................................................4
3. TERM OF FRANCHISE .................................................................................5
4. PERSONAL ATTENTION OF FRANCHISEE OR MANAGER TO BUSINESS ..............6
5. ESTABLISHMENT AND MAINTENANCE OF BUSINESS ...........................6
6. CONTINUOUS OPERATION OF BUSINESS ...............................................7
7. LIMITATIONS ON ACTIVITIES OF BUSINESS ..........................................7
8. PRICES CHARGED BY FRANCHISEE .........................................................8
9. FEES PAYABLE TO FRANCHISOR ..............................................................8
10. SERVICES AND PRODUCTS FURNISHED BY FRANCHISOR .....................9
11. TRAINING ...................................................................................................10
12. [INTENTIONALLY LEFT BLANK.] .............................................................12
13. ACCOUNTING PROCEDURES ...................................................................12
14. SERVICES, FIXTURES, EQUIPMENT, INVENTORY, AND SUPPLIES ..............13
15. DESIGN AND APPEARANCE OF BUSINESS .............................................15
16. ADVERTISING AND PROMOTION .............................................................15
17. INSURANCE .................................................................................................16
18. LEGAL COMPLIANCE, TAXES, LICENSES, UTILITIES & OTHER OBLIGATIONS ..........17
19. PROPRIETARY MARKS ..............................................................................17
20. TRADE SECRETS AND CONFIDENTIAL INFORMATION ..........................18
21. NONCOMPETITION ....................................................................................19
22. INSPECTION BY FRANCHISOR ................................................................21
23. FRANCHISEE AS INDEPENDENT CONTRACTOR ...................................21
24. INDEMNIFICATION ....................................................................................22
25. TRANSFER OF INTEREST .........................................................................23
26. DEFAULT AND TERMINATION .................................................................28
27. OBLIGATIONS ON EXPIRATION OR TERMINATION .............................30
28. ENTIRE AGREEMENT; EXECUTION DATE; MODIFICATION ................32
29. INTERPRETATION ......................................................................................32
30. PARTIAL INVALIDITY ...............................................................................34
31. WAIVER AND ESTOPPEL ...........................................................................34
32. ARBITRATION; ENFORCEMENT .............................................................34
33. NOTICES ......................................................................................................35
34. ACCEPTANCE, APPROVALS AND CONSENTS .........................................35
35. ACKNOWLEDGEMENTS BY FRANCHISEE ..............................................36
Attachment 1 – DEVELOPMENT TERRITORY ..............................................38
Attachment 1A – DEVELOPMENT TERRITORY (MAP & DATA) .................40
Attachment 2 – CORPORATION/LIMITED LIABILITY COMPANY/PARTNERSHIP INFORMATION
SHEET .............................................................................................................41
Attachment 3 – GUARANTY AGREEMENT ...................................................42
Attachment 4 – TELEPHONE LISTING AGREEMENT .................................43
Attachment 5 – EMPLOYEE/INDEPENDENT CONTRACTOR CONFIDENTIALITY &
NONDISCLOSURE AGREEMENT ..................................................................45
Attachment 6 – UCC-1 FINANCING STATEMENT .......................................46
Attachment 7 – LETTER OF CREDIT ...........................................................47
Attachment 8 – CARRIER SALES GUIDELINE AGREEMENT ....................49
Attachment 9 – CARRIER PARTNER - ADVERTISING & PROMOTION POLICY ..............50

USS Franchise Agreement 05.00                                                    4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") is made and entered into by and between UNITED SHIPPING SOLUTIONS, LLC, a Utah limited liability company whose address is 6985 Union Park Center, Suite 565, Salt Lake City, Utah 84047 ("FRANCHISOR") and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, whose address is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("FRANCHISEE"). If FRANCHISEE is a business entity, all references to FRANCHISEE in this Agreement shall include all of FRANCHISEE's individual owners, shareholders, members and partners, where the context permits.

## RECITALS

A.  FRANCHISOR has developed and will continue to develop certain proprietary business concepts, programs, methodologies, techniques, training, formats, and systems for use in establishing and operating a business promoting, marketing and reselling transportation services, primarily to small and medium-size businesses (the "System"). As part of the System, FRANCHISOR has established and/or acquired rights or licenses in and to contracts with providers of air express and freight services, who provide FRANCHISOR with volume discounts, portions of which are passed on to FRANCHISEE.

B.  FRANCHISOR also has expended time, skill, money, and effort in publicizing the System and the services offered under the System. FRANCHISOR is the owner of a license in and to certain trademarks, service marks, trade names, and/or trade dress which, in whole or in part, use or will in the future use the name "UNITED SHIPPING SOLUTIONS" and has or may develop or acquire ownership rights or licenses in and to other service marks, trademarks, trade names and trade dress for use in connection with the System, all of which service marks, trademarks, trade names and trade dress are or will be owned or licensed by FRANCHISOR (the "Marks"). FRANCHISOR has developed and will continue to develop valuable goodwill in the Marks.

C.  FRANCHISOR franchises others to use the System and the Marks, and provides to franchisees continuing advice on the establishment and operation of United Shipping Solutions transportation businesses (each, a "USS Transportation Business").

D.  FRANCHISEE desires FRANCHISOR to train and franchise it to use the Marks and all other elements of the System, and to derive the benefits of the System developed and franchised by FRANCHISOR and to establish, conduct, and operate a UNITED SHIPPING SOLUTIONS franchise according to this Agreement (hereinafter the "Franchise").

E.  FRANCHISEE has applied to FRANCHISOR for one UNITED SHIPPING SOLUTIONS Franchise, and such application has been approved by FRANCHISOR in reliance upon FRANCHISEE'S representations that FRANCHISEE has the capacity, organizational ability, marketing experience, facilities and interest to promote the image and goodwill of FRANCHISOR and the Marks and to meet FRANCHISOR'S standards of performance in areas such as sales, promotion, personnel, training, finances, payment of obligations and other criteria, all as set forth in this Agreement. FRANCHISEE acknowledges that it is essential to the maintenance of the standards which businesses have come to expect of FRANCHISOR'S services, and to the preservation of the integrity and goodwill of the Marks, that FRANCHISEE adhere to the standards for the establishment and operation of USS Transportation Businesses.

F.  FRANCHISEE acknowledges that it has read and fully considered this Agreement and FRANCHISOR'S Franchise Disclosure Document ("FDD") and has been given an opportunity to clarify any provisions that it did not understand, and further acknowledges that it understands and accepts and terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain FRANCHISOR'S high standards of quality and service and the uniformity

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANdata
FOR INTERNAL USE ONLY - NOT FOR RESALE

of those standards and thereby to protect and preserve FRANCHISOR'S goodwill and the goodwill of the Marks.

G. FRANCHISEE acknowledges that FRANCHISOR has made no projections of costs or revenues of such a business (other than those contained in FRANCHISOR'S FDD) and that FRANCHISOR has advised FRANCHISEE to seek the counsel of independent professionals respecting the terms and conditions of this Agreement. FRANCHISEE has independently and carefully assessed the risk of undertaking the business franchised under this Agreement, and has developed its own projections of the costs and possible revenues of such a business.

In consideration of the recitals above and of the terms below, FRANCHISOR and FRANCHISEE agree as follows:

## 1.   GRANT OF FRANCHISE

1.1 Subject to the terms and conditions of this Agreement, FRANCHISOR grants to FRANCHISEE the right, and FRANCHISEE hereby accepts and undertakes the duty, to establish and operate one UNITED SHIPPING SOLUTIONS Franchise in the Development Territory described in Section 2 and Attachment 1, for the term described in Section 3.

1.2 Subject to meeting the minimum average gross shipment quotas described in Attachment 1, the Franchise includes the non-exclusive right to use the Marks; the right to market transportation services (the "Services") in the Development Territory using the Marks; the right to operate one Franchise, and the right to promote and use the System in the operation of the Franchise in the Development Territory, with all the rights conditioned by this Agreement. Those rights encompass all forms of advertising, promotion and marketing which can reasonably be restricted to ZIP codes, including direct mailings, personal visits and leaflets. Notwithstanding the foregoing, FRANCHISEE may not maintain a Website, or otherwise advertise or promote the Franchise or the Services on the Internet, or any comparable electronic network.

1.3 The Franchise includes the right and obligation to use the complete System, as it exists or may be supplemented or modified during the term of the Franchise, as to the Services that FRANCHISEE is entitled to market. FRANCHISEE acknowledges that the System will continue to evolve in order to reflect changing market conditions and to meet new and changing consumer demands, and that variations and additions to the System may be required in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of FRANCHISOR'S franchised businesses generally. Accordingly, FRANCHISEE agrees that FRANCHISOR may, on notice and acting reasonably, add to, modify and change the System, including the adoption and use of new and modified service marks, trademarks, trade names, trade dresses, programs, equipment, computer software, techniques and methodologies relating to the preparation, marketing, promotion and sale of the Services, but any modifications or changes may not unreasonably increase FRANCHISEE'S obligations under this Agreement or place an excessive economic burden on the Franchise. FRANCHISEE further agrees to promptly accept, implement, use and display in the operation of the Franchise all of those additions, modifications and changes at its expense.

1.4 If FRANCHISEE is not in default of this Agreement, FRANCHISOR agrees not to physically locate a company-owned air express or freight franchise unit or another air express or freight franchised unit in the Development Territory.

## 2.   DEVELOPMENT TERRITORY

2.1 **Development Territory.** A "Development Territory" shall generally contain a minimum of about 12,500 businesses. The number of businesses in a Development Territory shall be determined by FRANCHISOR using Market Place software, a resource distributed by iMarket Inc., a Dunn & Bradstreet Company. FRANCHISEE'S Development Territory is more fully described in

USS Franchise Agreement 05.00                                                                                         4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

Attachment 1. FRANCHISEE agrees to use best efforts to solicit business within the Development Territory, and to locate, train and supervise sufficient numbers of employees to provide the Services in the Development Territory. FRANCHISEE shall, at a minimum, employ at least one sales representative per Development Territory. FRANCHISEE may not solicit or provide Services to individual customers outside of its Development Territory. FRANCHISEE may solicit the branch office of a customer located outside its Development Territory as long as FRANCHISEE'S Development Territory contains such customer's headquarters or home office in its Development Territory and the headquarters or home office utilizes central billing. If, when FRANCHISEE is granted the Development Territory, there are pre-existing customers in the Development Territory serviced by FRANCHISOR or another one of FRANCHISOR'S franchisees (a "Franchisee"), those pre-existing customers shall remain the customers of FRANCHISOR or the other Franchisee, at FRANCHISOR'S sole discretion. However, except as provided in this Agreement, FRANCHISOR shall withdraw its permission to the other Franchisees to market Services to customers in the Development Territory.

2.2   **Requests for Service Within Another FRANCHISEE'S Territory.** FRANCHISEE agrees not to solicit customers in another Franchisee's Development Territory. If FRANCHISEE receives any appropriate request for Services in another Franchisee's Development Territory, FRANCHISEE will refer the request to FRANCHISOR.

### 3.   TERM OF FRANCHISE

3.1   **Initial Term.** The term of the Franchise will begin on the execution date of this Agreement and will continue for an initial term of five (5) years unless sooner terminated pursuant to the terms of Section 26.

3.2   **Renewal Term.** FRANCHISEE will have the right to renew this Agreement and the Franchise for an additional five (5) year term, if:

> a)   FRANCHISOR has not given FRANCHISEE, at least 120 days before the expiration of the initial term, written notice of FRANCHISOR'S intention not to renew the Franchise for any of the following reasons:

>> (i)   For cause, including the failure of FRANCHISEE to comply with a term of this Agreement or to cure any default noticed under Section 26.

>> (ii)   FRANCHISOR is permitting FRANCHISEE, during the 120 days before the expiration of the initial term, to transfer the Franchise to a transferee meeting FRANCHISOR'S then current qualifications and requirements, or is permitting (at FRANCHISOR'S sole option) FRANCHISEE after expiration of the initial term to continue to operate its business in the Development Territory under a different trade name.

> b)   FRANCHISEE is solvent (is able to pay its debts as they come due or has assets the value of which are greater than its debts), has not abandoned the Franchise, is not operating the Franchise in a manner that endangers public health or safety, has not committed defaults of this Agreement during the initial term which have been noticed by FRANCHISOR and not timely cured by FRANCHISEE, has not failed to submit timely reports to FRANCHISOR during the initial term, and has not submitted false or incomplete reports to FRANCHISOR during the initial term.

> c)   FRANCHISEE, or any principal officer, managing member, or partner of FRANCHISEE if it is a corporation, limited liability company, or partnership,

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

has not been convicted of a felony or a crime involving moral turpitude, consumer fraud or any other offense that is reasonably likely, in the opinion of FRANCHISOR, to have an adverse effect on the Marks, the System, the goodwill associated with the Marks or System, or FRANCHISOR'S interest in the Marks or System.

d) FRANCHISEE has met the minimum average gross shipment quotas specified in Attachment 1 to this Agreement during each of the last six (6) months of the initial term, and

e) FRANCHISEE executes FRANCHISOR'S then current standard Franchise Agreement, which may contain terms substantially different from those in this Agreement.

## 4. PERSONAL ATTENTION OF FRANCHISEE OR MANAGER TO BUSINESS

4.1    FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S owner, principal shareholder, managing member, operating officer or partner), or a manager (if FRANCHISEE is not actively operating the business) who has successfully completed all required training and testing (a "Manager"), shall personally manage the Franchise. FRANCHISOR recommends that FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner) personally manage the Franchise.

4.2    FRANCHISEE understands and agrees that the success of the Franchise will depend on personal, continued and full-time attention to the Franchise by FRANCHISEE, FRANCHISEE'S principal shareholder, managing member, operating officer or partner, or FRANCHISEE'S Manager (if FRANCHISEE is not actively operating the Franchise). Personal, continued and full-time attention will include at least: availability during normal and peak business periods; participation in the development and implementation of management and operational policies; and involvement in the training and supervision of employees, and the training of independent contractors, to ensure that the System is followed.

## 5. ESTABLISHMENT AND MAINTENANCE OF BUSINESS

5.1    Unless otherwise agreed to between FRANCHISOR and FRANCHISEE, FRANCHISEE agrees to begin soliciting business within five (5) days after the successful completion of initial training by FRANCHISEE and no later than 45 days after signing the Franchise Agreement, and will maintain the Franchise continuously after that time; but if FRANCHISEE is delayed in beginning operations of the Franchise because of reasons beyond its control, FRANCHISEE will provide FRANCHISOR with a written request to delay commencement. The request will state: (1) that a delay is anticipated; (2) the reasons that have caused the delay; (3) the efforts FRANCHISEE is making to begin; and (4) an anticipated starting date. In considering the request, FRANCHISOR will not unreasonably withhold its consent to a delay if FRANCHISEE has been diligently pursuing the start of Franchise operations, so long as such delay does not exceed a cumulative period of 120 days after successful completion of initial training.

5.2    Establishing and maintaining the Franchise under Section 5.1 will involve at least all of the following:

(a)    Establishing an office for the operation of the Franchise.

(b)    Securing all permits and licenses necessary for the establishment and operation of the Franchise.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

  (c) Securing adequate telephone and facsimile services (minimum of one direct line each) for use in the Franchise and a telephone information listing, subject to the Telephone Listing Agreement attached as Attachment 4.  No other business will be transacted or advertised using any telephone number assigned to the Franchise.

  (d) Obtaining an operating voice mail or an answering service for the Franchise during both business and non-business hours.

  (e) Using FRANCHISEE'S or its Manager's best efforts to obtain customers.

  (f) Having sufficient employees and equipment available to provide the requested Services within the Development Territory, and

  (g) Establishing a computer system, inclusive of software, in accordance with the specifications as stated in FRANCHISOR'S FDD.

5.3 FRANCHISEE is not required to establish or maintain a commercial office in addition to the office described in Section 5.2(a) for the operation of the Franchise.  If choosing to establish and maintain a commercial office, however, FRANCHISEE must:

  (a) Conform the office to applicable building code requirements, and

  (b) Be responsible for securing all permits and licenses necessary for the establishment and operation of the office.

## 6. CONTINUOUS OPERATION OF BUSINESS

6.1 FRANCHISEE must operate the Franchise on a continuous basis throughout the year, and must be open for business each week of the year from at least 8 A.M. to 5 P.M., on at least Monday through Friday excluding major State and Federal holidays.

## 7. LIMITATIONS ON ACTIVITIES OF BUSINESS

7.1 In order to preserve the System and the identification of FRANCHISOR'S Franchisees operating under the Marks, FRANCHISEE agrees that the Franchise will not engage in activities other than those specifically approved in this Agreement, the FDD, or in writing by FRANCHISOR.  FRANCHISEE further agrees that it must obtain FRANCHISOR'S prior written consent to offer or sell any products or services other than those approved in this Agreement or the FDD.

7.2 FRANCHISEE may not engage in any deceptive or unfair trade practice or other activity, or offer any service or product which is harmful to the goodwill or reputation of FRANCHISEE, FRANCHISOR, the Franchise generally, the System, or the Marks.

7.3 FRANCHISEE must comply with the terms of the Sales Guideline Agreement (the form of which is attached hereto as Attachment 8) and any similar requirements of other carriers that may be added during the term of this Agreement.  FRANCHISEE, and each manager, employee and independent contractor working for FRANCHISEE, must execute the Sales Guideline Agreement, or an agreement substantially similar thereto.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

## 8.    PRICES CHARGED BY FRANCHISEE

8.1      FRANCHISEE will have the right to offer Services at any prices it may determine, consistent with the terms of any then-current carrier contract(s). If FRANCHISOR recommends a retail price, that price is suggested only, and is in no way binding on FRANCHISEE.

## 9.    FEES PAYABLE TO FRANCHISOR

**Initial Franchise Fee.** If this Agreement is not being executed as part of a renewal or transfer (as defined below) of the Franchise, FRANCHISEE must pay to FRANCHISOR, by wire transfer or cashier's check, upon the execution of this Agreement, the following Initial Franchise Fee: $̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲. Except as specified below, the Initial Franchise Fee or any portion of the Initial Franchise Fee is nonrefundable and fully earned by FRANCHISOR when paid. If, before the successful completion of FRANCHISEE'S initial training, FRANCHISOR, in its discretion, decides that FRANCHISEE should not operate a Franchise, FRANCHISOR may cancel or terminate this Agreement. If FRANCHISOR cancels or terminates this Agreement pursuant to this Section, FRANCHISOR shall refund the Initial Franchise Fee or any portion of the Initial Franchise Fee previously paid, less FRANCHISOR'S out-of-pocket costs of providing the initial training, provided that FRANCHISEE executes a general release and a non-competition agreement in a form reasonably satisfactory to FRANCHISOR.

9.1      **Continuing Franchise Fee.** FRANCHISEE must pay to FRANCHISOR a Continuing Franchise Fee of *6% of Gross Sales on all Air Express Shipments and 14% of Gross Margin on all Ground Delivery Service "GDS," Freight Service and Same Day Service shipments.* The Continuing Franchise Fee is assessed on each shipment and not on a cumulative shipment basis. If for any reason the Continuing Franchise Fee for any week falls below $500, FRANCHISEE must pay a Continuing Franchise Fee of $500 for such week. For purposes of clarity, the Continuing Franchise Fee payable by FRANCHISEE during each week during the term of this Agreement is the greater of (i) 6% of Gross Sales on all Air Express Shipments during such week (assessed on a per shipment basis) and 14% of Gross Margin on all Ground Delivery Service "GDS," Freight Service and Same Day Service (assessed on a per shipment basis) shipments during such week, or (ii) $500. The Continuing Franchise Fee is due and payable by the 30th day after invoice date. FRANCHISEE will be billed weekly.

9.2      **Advertising and Promotional Payments.** FRANCHISEE shall make advertising and promotional payments to FRANCHISOR as described in Section 16.

9.3      **Training Fees.** FRANCHISEE shall pay FRANCHISOR's then-current training fee, plus all travel, lodging and meal expenses, for all training provided by FRANCHISOR. FRANCHISOR's current training fee is $300 per day. FRANCHISEE shall bear all wages, benefits, and costs of its trainees and employees during training sessions. FRANCHISOR may increase the training fees at any time and from time to time in its discretion.

9.4      **Annual Seminar Fee.** FRANCHISEE shall pay for the annual seminar as described in Section 11.2(c).

9.5      **Audit and Inspection Fees.** FRANCHISEE shall pay audit and inspection fees as described in Sections 13.8 and 22.1.

9.6      **Renewal Fee.** If this Agreement is being executed as part of a renewal of the Franchise, FRANCHISEE shall pay to FRANCHISOR, upon execution, a Renewal Fee equal to $5,000 for each Franchise if purchased individually (not on same day) or $5,000 for the first Franchise and $1,000 for each additional Franchise when purchased on the same day. The Renewal Fee is nonrefundable and fully earned by FRANCHISOR when paid.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

9.7     **Transfer Fee.**  If this Agreement is being executed as part of a transfer, FRANCHISEE (if FRANCHISEE is the selling or transferring party) shall pay to FRANCHISOR, on the date that FRANCHISEE closes on the sale of the Franchise, the greater of (i) 15% of the sale price of the Franchise, and (ii) $5,000 (the "Transfer Fee").

9.8     **Interest and Late Fees.**  If any sum required to be paid by FRANCHISEE to FRANCHISOR under this Agreement is not actually received by FRANCHISOR by the due date, then (i) FRANCHISEE must pay a late fee equal to the lesser of 10% of the amount due and the highest amount allowed by law (the "Late Fee"), and (ii) the overdue amount will bear interest calculated daily after the due date until paid at a rate equal to the lesser of 10% per month and the highest rate of interest allowed by law.  If the due date for a sum is not specified in this Agreement, generally it will be the 30th day after billing date.  Any payment received toward an overdue sum will first be applied to Late Fees, then interest due, and will be applied to the overdue sum only after all outstanding Late Fees and interest are paid.  Late fees and interest will be in addition to any other rights or remedies that FRANCHISOR may have under this Agreement or otherwise. Regardless of any designation by FRANCHISEE, FRANCHISOR, in its sole discretion, will have the right to apply any payments by FRANCHISEE to any past due indebtedness of FRANCHISEE to FRANCHISOR, FRANCHISOR affiliates, or licensors. See also Section 13.8.

9.9     **Gross Sales.**  "Gross Sales" includes all receipts of FRANCHISEE, its officers, directors, members, employees, agents, salespersons or similar persons arising out of or in connection with the Franchise, whether for cash, credit or barter, excluding sales tax and use taxes, and bona fide refunds to customers.

        **Gross Margin.**  "Gross Margin" is defined as the difference between Gross Sales and the cost of goods sold.

9.10    **No Withholding of Sums Payable.**  FRANCHISEE agrees that it will not, on grounds of the alleged non-performance by FRANCHISOR of any of its obligations under this Agreement, withhold payment of any fee or other sum payable to FRANCHISOR under this Agreement, or of any other sum payable to FRANCHISOR or its affiliated companies.

9.11    **Past Due Fees.**  Outstanding Continuing Franchise Fee amounts (determined through monthly reconciliations by FRANCHISOR) will be payable within ten (10) days of FRANCHISEE'S receipt of written notice from FRANCHISOR.

9.12    **Management Expenses.**  If it is necessary for FRANCHISOR to act as interim manager of the Franchise, FRANCHISEE shall be obligated to pay FRANCHISOR'S then current management consulting fee, currently $300 per day, plus all actual costs for travel, lodging and meal expenses. See Section 25.7.  FRANCHISEE shall also bear the wages, benefits, and costs of its trainees and employees.  FRANCHISOR's per diem charge for management consulting may be increased from time to time at its discretion.

9.13    **Payments to Carrier Partners.**  FRANCHISOR may from time to time make payments to approved carrier partners or other approved vendors on behalf of FRANCHISEE.  In such event, FRANCHISEE shall promptly reimburse FRANCHISOR for any amounts that were paid on its behalf.

## 10.     SERVICES AND PRODUCTS FURNISHED BY FRANCHISOR

10.1    During the term of the Franchise, FRANCHISOR will provide the following:

        (a)     Periodic notices to FRANCHISEE concerning new, improved, or modifications to, products and services that FRANCHISEE may offer to customers, as well as improvements and developments in the System as they may be developed or acquired by FRANCHISOR in its discretion.

4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANdata
FOR INTERNAL USE ONLY - NOT FOR RESALE

(b)    Maintain a reasonable communications medium for franchisee support to address operating problems (i.e. 800 telephone number, email, and fax services).

(c)    Manuals, catalogs and related materials that, in FRANCHISOR'S judgment, may be beneficial to FRANCHISEE in the operation of the Franchise.

(d)    An exclusive Franchise account number or account number from another supplier FRANCHISOR chooses.

(e)    FRANCHISOR will provide FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner) and FRANCHISEE'S original Manager (if FRANCHISEE does not actively run the business) initial training for the operation of the Franchise at a time and place determined by FRANCHISOR. Initial training will last about 5 days. FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner), FRANCHISEE'S original Manager, if any, must successfully complete initial training and testing to FRANCHISOR'S satisfaction before opening the Franchise for business. FRANCHISOR will provide initial training at a cost to FRANCHISEE of $1,500. FRANCHISEE must pay this fee, which covers the cost of instructors and basic materials, prior to beginning training. FRANCHISEE shall bear the cost of its trainees' wages and benefits, travel, lodging and meal expenses. FRANCHISOR will provide 2 days of follow-up training at FRANCHISEE'S request, for an additional amount equal to FRANCHISOR'S then-current training fee (currently $300 per day).

10.2    If requested by FRANCHISEE, FRANCHISOR will furnish additional consulting, guidance, training and assistance relative to the operation of the business at FRANCHISOR'S then-current training fee. See also Section 11.2(a).

10.3    FRANCHISOR may maintain a Website or Websites on the Internet or any comparable electronic network to advertise and promote its franchise System and programs marketed by it or its franchisees. Any representations and warranties of any kind whatsoever, express or implied, regarding any Website, including representations and warranties as to the operation, functionality, lack of interruption or resources of the Website, are expressly excluded. Without limiting the foregoing, FRANCHISOR disclaims any implied warranties of merchantability and fitness for a particular purpose as to any Website. As to any malfunctioning of any Website, FRANCHISOR will not be liable to FRANCHISEE for any consequential, incidental, indirect, economic, special, exemplary or punitive damages, such as, but not limited to, loss of revenue or anticipated profits or lost business, even if FRANCHISEE has advised FRANCHISOR that such damages are possible as a result of any breach of warranty or malfunction.

10.4    FRANCHISOR'S obligations under this Agreement are to FRANCHISEE. No other person or entity, directly, indirectly or by subrogation, may rely on, enforce or obtain relief under this Agreement for any default by FRANCHISOR.

## 11.    TRAINING

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

11.1 FRANCHISEE and its employees and independent contractors must maintain the standards of skill, efficiency and quality required by this Agreement, the FDD and any other written requirement or standard delivered by FRANCHISOR to FRANCHISEE from time to time or which may be associated with the System.

11.2 To assist FRANCHISEE in establishing and maintaining those standards, FRANCHISOR will provide training as follows:

a) FRANCHISOR will provide FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner) and FRANCHISEE'S original Manager (if FRANCHISEE does not actively run the business) initial training for the operation of the Franchise at a time and place determined by FRANCHISOR. Initial training will last about 5 days. FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner), FRANCHISEE'S original Manager, if any, must successfully complete initial training and testing to FRANCHISOR'S satisfaction before opening the Franchise for business. FRANCHISEE must pay to FRANCHISOR a $1,500 Initial Training Fee prior to beginning initial training. This fee is non -refundable. FRANCHISOR reserves the right, in its sole discretion, to discount or waive in full or in part the Initial Training Fee. (See Section 10.1 Franchise Agreement). FRANCHISEE is responsible to pay its trainees' and attendees' salaries, benefits and other expenses during the initial training. FRANCHISOR will provide 2 days of follow-up training at FRANCHISEE'S request, for an additional amount equal to FRANCHISOR'S then current training fee (currently $300 per person per day).

b) If the original or any succeeding Manager leaves the employment of FRANCHISEE, a replacement Manager must successfully complete initial training and testing at a time and place determined by FRANCHISOR. FRANCHISEE must bear the cost of the succeeding Manager's wages and benefits, travel, lodging and meal expenses. FRANCHISEE also must pay FRANCHISOR its then current fees for the training.

c) FRANCHISOR will conduct an annual seminar for its franchisees to discuss FRANCHISOR and review new business and marketing ideas and concepts. FRANCHISOR, in its discretion, may hold the annual seminar on a regional, national or international basis. FRANCHISOR will provide FRANCHISEE notice of the time and place of the annual seminar, which time and place will be determined by FRANCHISOR. FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner) or FRANCHISEE'S Manager must attend each annual seminar. For each representative of FRANCHISEE attending the annual seminar, FRANCHISEE must pay all wages and benefits, travel, lodging and meal expenses, of its attendees. FRANCHISEE shall pay to FRANCHISOR a fee of $1,000 each year that FRANCHISEE fails to attend the annual seminar.

d) FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal shareholder, managing member, operating officer or partner) and FRANCHISEE'S Manager (if FRANCHISEE does not actively run the business) must successfully complete remedial or refresher training and testing if, in the discretion of FRANCHISOR, that training is necessary. As to that remedial or refresher training, FRANCHISEE must pay FRANCHISOR'S then current training fees (currently $300 per day per trainer), and must bear the cost of FRANCHISEE'S and its Manager's wages and benefits, travel, lodging and meal expenses. If remedial or refresher training or testing is held in FRANCHISEE'S Development Territory, FRANCHISEE also must bear the

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006



actual and reasonable travel, lodging and meal expenses of FRANCHISOR'S trainers in addition to FRANCHISOR'S then-current training fees.

11.3    Except as otherwise stated in this Section 11, FRANCHISEE is responsible for training its employees, agents, and independent contractors other than its Managers.

11.4    If FRANCHISEE requests FRANCHISOR'S trainers to travel outside their normal training area(s), or if such travel outside of their normal training area(s) to give any initial, additional, remedial or refresher training, training classes or testing becomes necessary for any reason, FRANCHISEE shall pay to FRANCHISOR the actual and reasonable travel, lodging and meal expenses of those trainers in addition to the then applicable fees associated with such training or testing, (currently $300 per day per trainer).

11.5    FRANCHISOR may require FRANCHISEE to make reservations for trainees or attendees in advance of any training or seminar. FRANCHISOR may require deposits for those reservations (which may be refunded or, in FRANCHISOR'S discretion, applied toward training or seminar fees) and may charge cancellation fee(s) if reservations are cancelled.

11.6    Prior to commencement of training, FRANCHISEE must obtain the computer hardware and computer software that is required under the FDD. FRANCHISOR will send out an information package and checklist of items for FRANCHISEE to complete which will include, but not be limited to, setting up the following: computer, printer, modem, all software, telephone, desk, fax machine, voicemail, business license, all forms, price sheets, supplies, business cards, etc. FRANCHISEE must then submit a completed checklist before initial training can begin.

11.7    Initial training will include, but not be limited to, an overview of the following: accounts receivable management, use of sales management software, use of accounting software, the collections process, making sales calls, staffing; interacting with carrier partners, FRANCHISOR and customers, meetings with carrier partner personnel, and demonstration of the sales process from start to finish.

11.8    In its discretion, FRANCHISOR may offer additional training classes, including, but not limited to, advanced sales training classes, at locations and times determined by FRANCHISOR. FRANCHISOR, in its discretion, may require FRANCHISEE and/or FRANCHISEE'S manager(s) and/or principal sales personnel to attend any additional training classes or to attend all or any part of initial training as a refresher training course, on reasonable notice. FRANCHISOR will provide each additional training class for a reasonable fee that FRANCHISOR will determine in advance based on the actual cost and length of the class. FRANCHISEE will pay this fee. FRANCHISEE will pay for each trainee's wages, benefits, travel expenses, lodging and meal expenses for each additional training class.

12.    [INTENTIONALLY LEFT BLANK.]


13.    ACCOUNTING PROCEDURES

13.1    FRANCHISEE must use FRANCHISOR'S designated accounts receivable management software. FRANCHISOR strongly recommends that FRANCHISEE also use FRANCHISOR'S recommended accounting software.

13.2    FRANCHISEE recognizes the importance of financial and statistical analysis, and on FRANCHISOR'S request, agrees to provide FRANCHISOR with monthly reports (by the 10th of each month for the preceding month) and monthly financial statements (by the 10th of each month for the preceding month). All financial information provided by FRANCHISEE to FRANCHISOR must be prepared in accordance with accounting methods acceptable to FRANCHISOR, consistently applied.

USS Franchise Agreement 05.00                                                                4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

13.3    FRANCHISEE must provide FRANCHISOR quarterly, within 40 days after the end of each calendar quarter, with a copy of its Employer's Quarterly Tax Return on Form 941, or its successor Form.

13.4    FRANCHISEE must provide FRANCHISOR annually, within 3 months after FRANCHISEE'S fiscal year end, with a statement of revenues, expenses and income (or loss) for the year, and of assets and liabilities as of the end of the year, which statement must be prepared in accordance with accounting methods acceptable to FRANCHISOR, consistently applied.    At FRANCHISOR'S option, it may require this statement to be prepared by an independent certified public accountant in accordance with the standards for a compilation or review.  Simultaneously with this statement, FRANCHISEE must provide FRANCHISOR with copies of all tax returns (including Employer's Quarterly Tax Filings) filed by FRANCHISEE for the year as to the Franchise, including federal and sate income tax returns and state sales or equivalent tax returns, and with business names, contact names, address and telephone numbers for all facilities at which FRANCHISOR services were offered by FRANCHISEE at any time during the year.

13.5    FRANCHISEE must submit to FRANCHISOR any other financial or statistical reports, records, statements or information that FRANCHISOR may reasonably require, in the forms and at the times and places reasonably specified by FRANCHISOR.

13.6    All financial or statistical information provided by FRANCHISEE to FRANCHISOR must be accurate in all material respects.

13.7    FRANCHISOR will have the right to use any financial or statistical information provided by FRANCHISEE as FRANCHISOR deems appropriate.  FRANCHISOR will not identify FRANCHISEE as the source of that information, and will not disclose any information shown in any tax returns of FRANCHISEE (other than information disclosed in other documents submitted to FRANCHISOR) except: (i) with FRANCHISEE'S permission; (ii) as required by law or compulsory order; or (iii) in connection with audits or collections under this Agreement.

13.8    FRANCHISOR or its designated agents will have the right, at all reasonable times, to examine, copy and audit FRANCHISEE'S and the Franchise's books, records and tax returns, including all accounts receivable and invoice information.  If an examination or audit discloses any underpayment of any fee, FRANCHISEE must promptly pay the deficient amount plus interest calculated daily from the due date until paid at the lesser of a rate equal to 10% per month or the highest rate of interest allowed by law.  If an examination or audit discloses an underpayment or understatement of a fee of 3% or more for any 3-month period, or if the examination or audit is made necessary by FRANCHISEE'S failure to furnish required information or documents to FRANCHISOR in a timely manner and in the form and manner that FRANCHISOR required, FRANCHISEE must, in addition to paying the amount of any underpayment, pay FRANCHISOR an audit fee of $450 per day plus all travel, lodging, meals and other out of pocket expenses, associated with the audit or examination of FRANCHISEE'S books.  If an examination or audit discloses an underpayment or understatement of 10% or more for any 3-month period, FRANCHISOR will have the right to terminate the Franchise under Section 26.1(g).  These rights and remedies will be in addition to any other rights or remedies FRANCHISOR may have under this Agreement or otherwise.

13.9    Both during the term of the Franchise and any extensions thereof, and for a period of 5 years after the termination of the Franchise, FRANCHISEE shall maintain and preserve all books, records and accounts of the Franchise.

14.    SERVICES, FIXTURES, EQUIPMENT, INVENTORY, AND SUPPLIES

14.1    FRANCHISEE may purchase its services from whomever it decides, except that:

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

(a)  FRANCHISEE must use the services of FRANCHISOR'S then-current approved supplier(s) of transportation services.

(b)  FRANCHISEE must use the services of FRANCHISOR'S then current approved vendor for billing services $.11 per shipment or $25 per month, whichever is greater.

(c)  FRANCHISEE must use services of FRANCHISOR'S then current approved vendor for mailing services.  Currently, FRANCHISEE must pay approximately $.46 per invoice mailing.

(d)  Supplies and services used by FRANCHISEE must meet specifications prescribed by FRANCHISOR.  The purpose of these specifications is to protect and maintain the goodwill of the Franchise, the System, and the Marks.

14.2  FRANCHISOR may maintain and make available to FRANCHISEE a list of certain equipment, supplies and services that meet FRANCHISOR'S specifications.  FRANCHISOR may modify this list at any time and from time to time.  If FRANCHISEE desires to use equipment, supplies or services not on the list, FRANCHISEE will so notify FRANCHISOR in writing prior to using equipment, supplies or services and, if FRANCHISOR so requests, will provide FRANCHISOR with all relevant data (including samples) that FRANCHISOR requests relating to the equipment, supplies or services.  At its option, FRANCHISOR will test any equipment, supply or services to determine whether they meet the required specifications and will so notify FRANCHISEE.  If FRANCHISOR determines that any equipment, supply or services do not meet the required specifications, FRANCHISEE agrees that it will not use the equipment, supply or services in the Franchise.  Grant and revocation of FRANCHISOR'S approval of carrier partners will be evaluated on the basis of performance and profits derived from services.  Revocation and grant of vendor billing and mailing services will be evaluated on a cost and performance basis.  The supplier of any equipment or supply or service proposed for use by FRANCHISEE under this Section 14.2 may be required to demonstrate to FRANCHISOR'S reasonable satisfaction that:

(a)  The supplier meets FRANCHISOR'S specifications, including its quality, quantity, warranty, variety, service and safety specifications, for the equipment, supplies or services.

(b)  The supplier has the capacity, including adequate facilities for production and distribution, to supply franchisee requirements.

(c)  The supplier has a sound financial condition and business reputation.

14.3  FRANCHISOR or its related companies may offer to sell to FRANCHISEE equipment, supplies and services used in operating a Franchise, which may be purchased by FRANCHISEE at its option.  FRANCHISOR or its related companies will endeavor, to the extent they are able to do so based on total purchases by Franchisees, to negotiate volume purchasing arrangements for equipment, supplies and services from suppliers to offer them to Franchisees at prices not otherwise generally available to the Franchisees.

14.4  To the extent FRANCHISOR is not the manufacturer of any equipment or supply it may sell or provide to FRANCHISEE, unless specifically stated otherwise in writing, FRANCHISOR does not provide any warranty or guarantee to FRANCHISEE or any third party.  If FRANCHISOR is able to secure from any manufacturer any warranty, guarantee or assumption of liability that it is authorized to convey to FRANCHISEE, it will so notify FRANCHISEE.

14.5  At its own expense, FRANCHISEE must obtain computer hardware, computer software, and other equipment and office supplies, and use them in the operation of the Franchise, as required by

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANCHISOR in the FDD or otherwise. FRANCHISOR may supplement, remove, replace and/or modify any computer hardware, computer software, equipment or office supply requirement or recommendation in its discretion, and FRANCHISEE will comply with any such change, at its own expense, promptly on reasonable notice from FRANCHISOR. FRANCHISEE acknowledges that, unless expressly provided otherwise in writing, FRANCHISOR does not guaranty or warranty any required or recommended computer hardware, computer software, equipment or office supply in any manner, and disclaims all implied warranties, including warranties of merchantability and fitness for particular purpose, to the extent permitted by law.

14.6 FRANCHISEE agrees to pay all invoices rendered by approved suppliers within payment terms set forth in the vendor contracts.

## 15. DESIGN AND APPEARANCE OF BUSINESS

15.1 FRANCHISEE is not required to establish a commercial office for the operation of the Franchise. If, however, FRANCHISEE chooses to establish and maintain a commercial office, FRANCHISEE acknowledges that the design and appearance of the office must be in conformity with the design and appearance of other Franchisee offices.

15.2 FRANCHISEE must maintain any commercial office and all adjacent areas in good, clean, attractive and safe condition at all times. FRANCHISEE must, at its expense, undertake all maintenance and make all repairs, replacements, alterations and additions as may be required for that purpose, including such periodic cleaning, repainting, repairs and replacement of obsolete fixtures, equipment, and furnishings as FRANCHISOR may reasonably require.

15.3 FRANCHISEE, at its or its employees' expense, will cause its employees and independent contractors to present themselves to customers and prospective customers, in terms of general appearance, dress and accessories, in accordance with standards that may be prescribed by FRANCHISOR from time to time.

## 16. ADVERTISING AND PROMOTION

16.1 FRANCHISOR does not currently operate an advertising or promotional fund (a "Fund"). Subject to the terms and conditions of this Agreement, FRANCHISEE may use its own advertisements and advertising materials to promote the Franchise. Recognizing the value of marketing and the importance of the standardization of promotions and public relations services to the furtherance of the goodwill and public image of FRANCHISOR'S System and the Marks, FRANCHISEE may contribute to a Fund, if FRANCHISOR establishes such Fund.

16.2 [Intentionally Left Blank.]

16.3 FRANCHISOR may establish (on a regional, national or international basis) a toll-free telephone service to assist in the development, maintenance and promotion of the System. If FRANCHISOR establishes that service, FRANCHISEE must use the service as directed by FRANCHISOR, and FRANCHISOR may require FRANCHISEE to pay FRANCHISOR a proportionate share of the cost of the service and its administration, as determined by FRANCHISOR, on a monthly basis.

16.4 FRANCHISEE must maintain and pay for appropriate business listings in appropriate Development Territory telephone directories.

16.5 FRANCHISEE may not advertise or promote the Franchise outside the Development Territory through the use of direct mailings, a toll-free or comparable number, catalogues or any other means. FRANCHISEE may not maintain a Website, or otherwise advertise or promote the Franchise on the Internet, or any comparable electronic network.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

16.6    If FRANCHISEE uses advertising or uses promotional materials, those advertising and promotional materials must be dignified and be pre-approved by FRANCHISOR. If prescribed advertising or promotional materials are available from FRANCHISOR, FRANCHISEE may not use any materials other than those prescribed by FRANCHISOR, and must pay all reasonable fees and expenses associated with the provision of those materials. Otherwise, FRANCHISEE must submit samples to FRANCHISOR (by fax, or by receipted or delivery service) and obtain FRANCHISOR'S prior written approval (except as to prices to be charged), of all advertising and promotional materials (including direct mailings, leaflets, brochures, signs, audios, videos, CDs and Internet or comparable electronic network communications) that FRANCHISEE desires to use and that have not been prepared or previously approved by FRANCHISOR. If written approval or rejection is not received by FRANCHISEE (by fax, or by receipted mail or delivery service) within 10 days after FRANCHISOR'S receipt of the materials, FRANCHISOR will be deemed to have given required approval. If any advertising or promotional materials previously approved by FRANCHISOR are later disapproved, FRANCHISEE must discontinue their use promptly on written notice from FRANCHISOR.

## 17.   INSURANCE

17.1    FRANCHISEE must secure insurance before starting operations, and then must continuously maintain that insurance during the term and any extensions of the Franchise, at FRANCHISEE'S expense, as follows:

    (a)    General liability insurance with a limit of at least $1,000,000 per person per occurrence.

    (b)    Automobile liability insurance with a $500,000 combined single limit or a $250,000/$500,000 split limit for FRANCHISEE and each employee.

    (c)    Worker's compensation or similar insurance as required by the law of the state(s) or jurisdiction in which FRANCHISEE is engaged in business. This insurance must be maintained for trainees, as well as, for those employed or engaged in the operation of the Franchise.

17.2    If circumstances require for the protection of FRANCHISEE and FRANCHISOR, FRANCHISOR, in its discretion may increase or modify the insurance limits noted above and may require additional types of insurance. If FRANCHISOR determines that any required insurance is not generally available to FRANCHISEE, at a cost that FRANCHISOR in its discretion, deems to be reasonable, then FRANCHISOR may modify the insurance requirements, on a case-by-case basis, to provide for lower limits for a particular franchisee until the insurance becomes available at a reasonable cost.

17.3    Each insurance policy maintained by FRANCHISEE for the Franchise and its employees must: name FRANCHISEE, FRANCHISOR, and FRANCHISOR's affiliates as additional insureds; require the insurer to defend each additional insured if there is a claim; provide that any liability coverage afforded applies separately to each person or entity against whom a claim is brought as though a separate policy had been issued to that person or entity. Contain no provision limiting or reducing coverage if there is a claim by one or more additional insureds; and provide coverage for FRANCHISEE'S indemnification obligation under Section 24.2 of this Agreement. Coverage for the additional insureds will apply on a primary basis irrespective of any other insurance, whether collectable or not. All insurance policies must be issued by insurance companies with performance ratings of at least A+ as rated in the most recent edition of Best's Insurance Reports or comparable publication.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

17.4   Within 30 days after commencing operations and then annually when coverage is renewed, FRANCHISEE must furnish to FRANCHISOR a copy of each insurance policy, evidencing the limits noted above or as then required, and proof of premium payments, and providing that the insurance will not be cancelled, amended or modified without 30 days' prior written notice to FRANCHISOR, together with evidence of payment of premiums.

17.5   FRANCHISEE may not reduce any insurance limit, restrict any insurance coverage or cancel, alter or amend any insurance policy without FRANCHISOR'S prior written consent.  If FRANCHISEE fails to obtain or maintain any required insurance, FRANCHISEE agrees that FRANCHISOR may, but is not obligated to, obtain the insurance and FRANCHISEE will reimburse FRANCHISOR for the cost of the insurance within 30 days of the date of FRANCHISOR'S invoice.

## 18.   LEGAL COMPLIANCE, TAXES, LICENSES, UTILITIES & OTHER OBLIGATIONS

18.1   FRANCHISEE must (i) comply with all laws applicable to the operation of the Franchise, including all federal, state, and local administrative and governmental regulations and ordinances relating to fictional business names, interstate commerce, shipping, occupational hazards, health, consumer protection, and unfair or deceptive practices, must secure and promptly pay for all licenses, permits and inspections; and (ii) promptly pay all applicable federal, state, and local withholding, unemployment, occupational, privilege, license, sales, use and income taxes and the like, including all taxes and fees levied and asserted on FRANCHISEE'S business property, and all water, sewer, gas, telephone, electric, power, and other utility charges assessed or charged to the Franchise.

18.2   FRANCHISEE must promptly satisfy any other indebtedness that it incurs in operating the Franchise.

18.3   FRANCHISEE must promptly notify FRANCHISOR of the commencement of any action, suit or proceeding, or of the issuance of any order, writ, injunction, award or decree of any court or agency, that may adversely affect the operation of the Franchise.

## 19.   PROPRIETARY MARKS

19.1   The Marks are the exclusive property of, or are separately licensed to (as more particularly set forth in the FDD at Item 13), FRANCHISOR.  FRANCHISEE acknowledges that its use of the Marks is a temporary authorized use under a license and that, as between FRANCHISOR and FRANCHISEE, FRANCHISOR retains all ownership interests in the Marks and all goodwill generated by the Marks.  All uses of the Marks by FRANCHISEE will inure to the benefit of FRANCHISOR.  FRANCHISEE agrees to use the Marks only in accordance with the terms of this Agreement and acknowledges that the use of the Marks outside the scope of the terms of this Agreement without FRANCHISOR'S prior written consent, is an infringement of FRANCHISOR'S rights, title, and/or interest in and to the Marks.   FRANCHISEE agrees that during the term of the Franchise, and after the repurchase, expiration or termination of the Franchise, FRANCHISEE will not, directly or indirectly, commit an act of infringement or contest or aid others in contesting the validity, distinctiveness, secondary meaning, ownership or enforceability of the Marks, or take any other action in derogation of FRANCHISOR'S rights, title, and/or interest in the Marks.

19.2   FRANCHISEE must do business under the Mark "UNITED SHIPPING SOLUTIONS" or any replacement Marks that FRANCHISOR designates.  Except as FRANCHISOR permits in writing, FRANCHISEE shall not use any Mark or any name or mark confusingly similar to any Mark, any derivation or modified version of any Mark, or any confusingly similar Mark as part of any corporate partnership, firm or other business name, Website address, email address, domain name or other identification; in any print, electronic or other medium; or with any prefix, suffix or other modifying word, term symbol or design.  FRANCHISEE agrees to execute, during or after the

USS Franchise Agreement 05.00                                                                        4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.

term of the Franchise, at FRANCHISOR'S request, any consents necessary for the registration of FRANCHISOR'S business name in the state(s) where FRANCHISEE conducts the Franchise.

19.3    FRANCHISEE agrees that when any Mark is affixed to any packaging or is used in advertising or promotional materials, the Mark will be accompanied either by an appropriate notice immediately following the Mark ("TM" if on a product package and "SM" if advertising a service) or by an asterisk immediately following the Mark and the legend "*Service Mark or Trademark of United Shipping Solutions, LLC, (or other appropriate corporate or business name)" printed on or in the package, advertisement or material.   A suitable abbreviated form of the legend, approved by FRANCHISOR, may be used where space restrictions so require.   After a Certificate of Registration is received by FRANCHISOR from the United States Patent and Trademark Office for any Mark, the symbol "®" will be substituted for the notices described above, and the word "Registered" will precede the word "Service" in the legend described above.

19.4    If it becomes advisable at any time in FRANCHISOR'S judgment or the business to modify or discontinue use of any Mark and/or to use one or more additional or substitute service marks, trademarks, trade names or trade dress, FRANCHISEE agrees to comply with FRANCHISOR'S directions to modify or otherwise discontinue the use of the Mark, and/or to use one or more additional or substitute service marks, trademarks, trade names or trades dress, within a reasonable time after receiving notice from FRANCHISOR.   FRANCHISEE will be responsible for the costs of modifying or discontinuing the use of any trademark, service marks or trade names. FRANCHISOR will not be responsible for reimbursing FRANCHISEE for any loss of goodwill in connection with the modification or discontinuation of any trademark, service mark or trade name.

19.5    During the term of the Franchise, in conjunction with the use of any Mark, FRANCHISEE must identify itself as the owner of the Franchise on letterhead sheets, invoices, order forms, receipts, contracts and similar documents.

19.6    During the term of the Franchise, FRANCHISEE must file and maintain requisite trade name or fictitious name registration, and must execute any documents deemed necessary by FRANCHISOR or its counsel to obtain protection for the Marks or maintain their continued validity and enforceability.

19.7    FRANCHISEE must promptly notify FRANCHISOR of any use, by any person or entity other than FRANCHISOR or another Franchisee, of any Mark or any name or mark confusingly similar to any Mark.

19.8    FRANCHISEE must promptly notify FRANCHISOR of any litigation brought or threatened by any person or entity against FRANCHISEE, involving any Mark.   If FRANCHISOR, in its discretion, undertakes the defense or settlement of that litigation or claim, it will do so at its own expense, but FRANCHISEE agrees to execute any documents, and to render any assistance (excluding financial assistance) as may, in the opinion of FRANCHISOR'S counsel, be reasonably necessary to carry out the defense or settlement. If the defense does not involve issues concerning the operation of FRANCHISEE'S business FRANCHISOR will reimburse FRANCHISEE for all reasonable out-of-pocket costs incurred in connection with assisting in the defense or settlement.

19.9    FRANCHISEE agrees that the use of any Mark contrary to any term of this Agreement is an act of infringement, and that the use will cause irreparable injury to FRANCHISOR and entitle FRANCHISOR to an order of specific performance and/or a temporary, preliminary or permanent injunction, without bond, from a court or agency of competent jurisdiction, court costs, reasonable expenses of litigation, reasonable attorney's fees, and any other appropriate relief.

## 20.    TRADE SECRETS AND CONFIDENTIAL INFORMATION

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

20.1    FRANCHISEE acknowledges that the System involves trade secrets owned by FRANCHISOR and that, during its relationship with FRANCHISOR, FRANCHISEE will acquire knowledge of confidential information, including know-how, sales, organizational, operational and other information concerning the System.

20.2    FRANCHISEE agrees that, without FRANCHISOR'S prior written consent, it will, not, either during or after the term of the Franchise, use or allow the use of any trade secret or confidential information except in connection with the operation of the Franchise by persons actively involved in the operation of the Franchise.  FRANCHISEE further agrees that it will not disclose the contents of any manuals, plans, records or other documents relating to the Franchise to any third party, except a party who is actively involved in the operation of the Franchise and who has a valid need for disclosure.  Any third party or employee to whom a trade secret or confidential information is disclosed will be informed that the trade secret or confidential information is confidential and proprietary to FRANCHISOR and that it may not be used except under a franchise agreement, or confidentiality and nondisclosure agreement with FRANCHISOR. FRANCHISEE must have each of its Managers, supervisory employees and independent contractors, and persons attending initial sales training enter into a Confidentiality and Nondisclosure Agreement substantially similar to Attachment 5, and must have each of its instructors and other non-supervisory employees and independent contractors, and persons attending only remedial or follow-up sales training enter into a Confidentiality and Nondisclosure Agreement substantially similar to Attachment 5, all copies of which shall be sent to FRANCHISOR upon completion.

20.3    FRANCHISEE agrees to promptly reveal to FRANCHISOR discoveries, inventions, innovations or improvements made by FRANCHISEE or any of FRANCHISEE'S Managers, instructors, employees or independent contractors relating to materials, devices, methods or processes in any way connected with the Franchise and System, and further agrees that all proprietary interests in the information, materials, devices, methods, techniques, know-how and processes utilizing those discoveries, inventions, innovations and improvements will be the property of FRANCHISOR.

20.4    FRANCHISEE agrees that use of any trade secret or confidential information contrary to any term of this Agreement is an act of infringement, and that the use will cause irreparable injury to FRANCHISOR and entitle FRANCHISOR to an order of specific performance and/or a temporary, preliminary and permanent injunctions, without bond, from a court or agency of competent jurisdiction, court costs, reasonable expenses of litigation, reasonable attorney's fees, and any other appropriate relief.  FRANCHISEE agrees that its only remedy if an injunction is entered against FRANCHISEE will be the dissolution of that injunction, if warranted, on due hearing, and expressly waives all claims for damages caused by the wrongful issuance of any injunction.

## 21.    NONCOMPETITION

21.1    Unless otherwise specified in this Agreement, the term "FRANCHISEE" in this Section 21 includes, collectively and individually, each shareholder, member, partner, officer and director, and each direct or indirect holder (and each shareholder, member, partner, officer or director of each holder) of any beneficial interest in FRANCHISEE.

21.2    FRANCHISEE agrees that during the term of the Franchise, FRANCHISEE will not, directly or indirectly, for itself, or through, on behalf of or in conjunction with any person or entity, divert or attempt to divert any business or customers of the Franchise, FRANCHISOR, or any other Franchisee to any competitor or other person by inducement or otherwise.

21.3    FRANCHISEE agrees that during the term of the Franchise, and for 2 years after the later of: 1) expiration or termination of the Franchise, regardless of the cause of expiration or termination; or 2) the date of final judgment or order of any court or tribunal that enforces this Section 21, FRANCHISEE will not, without the prior written consent of FRANCHISOR, directly or indirectly, for itself, or through, on behalf of or in conjunction with any person or entity, employ,

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANdata
FOR INTERNAL USE ONLY - NOT FOR RESALE

engage as an independent contractor, or seek to employ or engage as an independent contractor, any person or entity who, within the prior 6 months, has been an employee or independent contractor of FRANCHISOR or any other Franchisee, or induce or seek to induce any person or entity who is an employee or independent contractor of FRANCHISOR or any other Franchisee to leave his or her employment or engagement.

21.4    FRANCHISEE acknowledges: that certain methods of doing business and other elements comprising the System are unique and distinctive, and have been developed by FRANCHISOR at great effort, skill, time and expense; that FRANCHISEE will have regular and continuing access to valuable trade secrets, confidential information and valuable training regarding the Franchise and System; and that FRANCHISEE recognizes its continuing obligation to promote the Franchise. FRANCHISEE accordingly agrees as follows:

(a)    During the term of the Franchise, FRANCHISEE will not, without FRANCHISOR'S prior written consent, directly or indirectly, for itself, or through, on behalf of or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service for any business or person which offers services or products that are the same as or substantially similar to services or products that are or could be offered by FRANCHISEE under this Agreement, and which operates in the United States or in any foreign country where FRANCHISOR, any of FRANCHISOR'S other Franchisees, or any other related entity is operating.

(b)    FRANCHISEE agrees that, for an uninterrupted period of 2 years after the later of: 1) expiration or termination of the Franchise, regardless of the cause of expiration or termination; or 2) the date of final judgment or order of any court or tribunal that enforces this Section 21, FRANCHISEE will not, without FRANCHISOR'S prior written consent, directly or indirectly, for itself, or through, on behalf of or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service for any business or person which offers services or products that are the same as or substantially similar to services or products that were or could have been offered by FRANCHISEE under this Agreement, and which operates in the United States.

21.5    FRANCHISEE acknowledges that its violation of any term of this Section 21 will cause irreparable injury to FRANCHISOR for which no adequate remedy at law is available. FRANCHISEE accordingly consents to the issuance of an order of specific performance and/or a temporary, preliminary and permanent injunction, without bond, prohibiting any conduct by FRANCHISEE in violation of any term of this Section 21.

21.6    Each term and subpart of a term of this Section 21 is independent of each other term and subpart of a term of this Agreement. If a term or subpart of a term of this Section 21 is held unreasonable or unenforceable by any court, agency or other tribunal of competent jurisdiction, FRANCHISEE agrees that a court, agency, or arbitrator may determine, and FRANCHISEE agrees to be bound by, any lesser requirement, term or subpart that imposes the maximum duty permitted by law and equity, as if the resulting lesser requirement, term or subpart were separately stated in this Section 21. If an entire requirement or covenant in this Section 21 is held invalid, unreasonable or unenforceable by a court, agency, or arbitrator, then the remaining covenants in this Section 21 will continue in effect to the fullest extent permitted by law and equity.

21.7    FRANCHISEE acknowledges that FRANCHISOR may, in its discretion, reduce the scope of any term or subpart of any term in this Section 21 without FRANCHISEE'S consent, effective

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006



immediately on written notice from FRANCHISOR, and FRANCHISEE agrees that it will promptly comply with any term or subpart so modified, which will be fully enforceable notwithstanding any other term or subpart of this Agreement.

21.8 FRANCHISEE agrees that any claim it may have against FRANCHISOR, whether or not related to the Franchise, will not be a defense to the enforcement by FRANCHISOR of any term of this Section 21.

21.9 This Section 21 will not apply to any ownership by FRANCHISEE of less than a 3 % beneficial interest in the outstanding equity securities of any publicly held corporation.

21.10 In any legal action for damages, injunctive relief, the return of property or any other legal or equitable remedy under this Section 21, FRANCHISEE waives, and assigns to FRANCHISOR, all homestead rights and exemptions that it may have under any law as against any obligation under this Section 21.

21.11 FRANCHISEE will have each of its Managers, employees and independent contractors enter into a Confidentiality and Nondisclosure Agreement substantially similar to Attachment 5.

## 22.    INSPECTION BY FRANCHISOR

22.1 A field representative or designee of FRANCHISOR may make an announced or unannounced inspection of the Franchise, including any place where FRANCHISEE is conducting the business of the Franchise, at any reasonable time to ensure compliance with all terms of this Agreement, which inspection may include interviews of FRANCHISEE'S Managers, employees, agents, professionals, and independent contractors to ascertain their knowledge of and compliance with this Agreement, any other written requirements imposed by FRANCHISOR, and the System. FRANCHISEE agrees that the field representative or designee will be allowed to take a physical inventory of the assets of the Franchise, and to inspect any records of the Franchise, including FRANCHISEE'S books and financial accounts, accounts receivable and invoice information, at any time during normal business hours.  Any inspection will be made at the expense of FRANCHISOR or its designee, but if FRANCHISOR or its designee is required to make 2 inspections in any 6-month period concerning FRANCHISEE'S repeated or continuing failure to comply with this Agreement, FRANCHISOR will have the right to charge FRANCHISEE for the costs of making the second inspection and any further inspections concerning its failure to comply, including FRANCHISOR'S audit fee of $450 per day plus all travel, lodging, meal and other out of pocket expenses of FRANCHISOR'S field representative or FRANCHISOR'S designee.  At the conclusion of his or her inspection, the field representative or designee will prepare a written report.  FRANCHISEE (or if FRANCHISEE is not an individual, FRANCHISEE'S principal operating officer or partner), if present, or FRANCHISEE'S Manager, will be given a copy of the report and will sign a second copy to be sent to FRANCHISOR, on which he or she may acknowledge or contest the field representative's or designee's conclusions and observations.

22.2 During any inspection, FRANCHISEE agrees to cooperate fully and to give any assistance reasonably requested.  Promptly after receiving notice of any deficiencies detected in an inspection, FRANCHISEE agrees to take steps necessary to correct the deficiencies, including if necessary the temporary closing of the Franchise. Without limiting FRANCHISOR'S other rights and remedies, FRANCHISOR will have the right, if FRANCHISEE fails or refuses to act promptly, to make or cause to be made any required corrections and to charge the cost of correction to FRANCHISEE.

## 23.    FRANCHISEE AS INDEPENDENT CONTRACTOR

23.1 This Agreement does not create a partnership, joint venture, fiduciary, parent/subsidiary, principal/agent or employer/employee relationship between FRANCHISOR and FRANCHISEE. FRANCHISEE will be an independent contractor with entire control and direction of the

USS Franchise Agreement 05.00                                                                      4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

Franchise, subject only to the terms of this Agreement and the related agreements. The Franchise will be totally separate from any business that may be operated by FRANCHISOR. FRANCHISEE will conspicuously identify itself in all dealings with customers, suppliers, public officials, FRANCHISEE personnel and others as the independent owner and operator of the business under a franchise granted by FRANCHISOR, and will place notices of independent ownership and operation on such signs, forms, business cards, stationery, advertising and other materials as FRANCHISOR may require. FRANCHISOR will have no right to hire or fire any employees or independent contractors of FRANCHISEE or to exercise any control over those employees or independent contractors, all of whom will be entirely under the control and direction of FRANCHISEE, who will be responsible for their acts and omissions.

23.2    No party to this Agreement may make any representation tending to create an apparent partnership, joint venture, fiduciary, parent/subsidiary, principal/agent or employer/employee relationship between FRANCHISOR and FRANCHISEE. No party may act for or on behalf of any other party in any manner to create obligations or debts binding on the other party, or may make any agreement, warranty or representation on behalf of any other party. No party is responsible for any obligations, debts or expenses of any other party.


## 24.    INDEMNIFICATION

24.1    FRANCHISOR must indemnify FRANCHISEE, FRANCHISEE'S affiliates, successors and assigns, and FRANCHISEE'S partners, members, shareholders, officers, directors, employees and agents, for any expenses arising out of any claim for copyright or trademark infringement or unfair competition directly or indirectly related to FRANCHISEE'S authorized use of FRANCHISOR'S material or the Marks under this Agreement, if FRANCHISEE notifies FRANCHISOR in writing within 30 days, or within any shorter period necessary to avoid prejudice, after learning of the claim, and also if FRANCHISOR is given the right, if it chooses to exercise that right, to control the settlement or defense of the claim. FRANCHISEE shall cooperate with FRANCHISOR in its defense of the claim and shall make available to FRANCHISOR all documents, and render all assistance, reasonably required by FRANCHISOR to carry out the defense.

24.2    FRANCHISEE must indemnify FRANCHISOR, FRANCHISOR'S affiliates, successors and assigns, and FRANCHISOR'S partners, members, shareholders, officers, directors, attorneys, employees, and agents, for any expenses arising out of any claim directly or indirectly related to FRANCHISEE'S operation of the Franchise or performance or lack of performance under this Agreement, if the claim does not arise from the sole negligence or willful misconduct of FRANCHISOR, including without limitation (i) an indemnification of FRANCHISOR in connection with FRANCHISOR'S guarantee of payment of FRANCHISEE'S obligations to FRANCHISOR'S carrier partner(s) (or any payment made by FRANCHISOR to a carrier partner on behalf of FRANCHISEE), and (ii) an indemnification of FRANCHISOR in connection with FRANCHISOR'S guarantee of payment of FRANCHISEE'S obligations to the then current vendor of billing and mail services. FRANCHISEE hereby grants FRANCHISOR a first position security interest in and to all of FRANCHISEE'S customers, accounts, billings, accounts receivable, and all supporting documents, securing the payment and performance of FRANCHISEE'S indemnification obligations hereunder and FRANCHISEE'S other payment obligations to FRANCHISOR contained in this Agreement. FRANCHISEE must execute a Uniform Commercial Code Financing Statement ("UCC-1"), in substantially the form attached hereto as Attachment 6, to perfect FRANCHISOR'S security interest in FRANCHISEE'S customers, accounts, billings, accounts receivable, and all supporting documents. If it is necessary for FRANCHISEE to participate in FRANCHISOR'S Franchise Development Program (FDP) due to credit concerns, FRANCHISEE further agrees to obtain an Irrevocable Standby Letter of Credit (Automatically Renewable) in the form attached hereto as Attachment 7, in the principal amount of $10,000.00 in favor of FRANCHISOR, securing these indemnification obligations and FRANCHISEE'S other payment obligations to FRANCHISOR contained in this Agreement. FRANCHISOR'S exercise of any rights with respect to the UCC-1 and/or Letter of Credit shall not be deemed to limit or waive any other rights that FRANCHISOR may have under this

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

Agreement or otherwise. In the event FRANCHISOR is forced to draw on the Letter of Credit, whether a complete or partial draw, then FRANCHISEE shall be required immediately to replenish or reestablish the Letter of Credit to its full principal amount of $10,000.00. The fact that FRANCHISOR shall have made any draw, whether complete or partial, shall not preclude FRANCHISOR from making subsequent draws.

24.3    FRANCHISEE must promptly notify FRANCHISOR of any claim by or against FRANCHISEE directly or indirectly related to FRANCHISEE'S operation of the Franchise and, on request, must furnish FRANCHISOR with copies of any filings in any proceeding involving the claim.

24.4    As used in this Section 24, the word "expenses" includes all losses, compensatory, exemplary or punitive damages, fines, charges, costs, lost profits, attorneys' fees, accountants' fees, expert witness fees, expenses, court costs, settlement amounts, judgments, compensation for damages to reputation or goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and costs of recall, refunds, compensation and public notices.

24.5    The indemnification obligations of FRANCHISOR and FRANCHISEE will survive the expiration or termination of the Franchise for as long as any potential for liability under any applicable law, rule, ordinance, statute or judicial decision remains. In this regard, to the maximum extent permitted by law, FRANCHISOR and FRANCHISEE each waives the effect of any statute of limitation that would, by lapse of time, limit its indemnification obligations.

## 25.    TRANSFER OF INTEREST

25.1    <u>Transfer by FRANCHISOR.</u>   FRANCHISOR may sell, assign, convey, give away, pledge, hypothecate, mortgage or otherwise transfer ("transfer") all or any part of its rights, interests or obligations in this Agreement to any person or entity.

25.2    <u>Transfer by FRANCHISEE.</u>

(a)     FRANCHISEE acknowledges that its rights and obligations under this Agreement are personal to FRANCHISEE, and that FRANCHISOR has granted the Franchise in reliance on FRANCHISEE'S and/or its principals' business skill, financial capacity, personal character, and reputation for honesty, integrity and fair dealing. Accordingly, FRANCHISEE, any successor to any part of FRANCHISEE'S interest in this Agreement, any related agreements, the Franchise or the entity owning this Franchise, any shareholder if FRANCHISEE is a corporation, or any member or general or limited partner (including any person or entity which controls, directly or indirectly, any member, general or limited partner) if FRANCHISEE is a limited liability company or partnership, may not transfer any interest in FRANCHISEE, this Agreement, any related agreement, the Franchise or the entity owning a controlling interest in this Franchise, without the prior written consent of FRANCHISOR. Any purported transfer not having the prior written consent of FRANCHISOR will be null and void.

(b)     FRANCHISOR will not unreasonably withhold its consent to a transfer of any interest in FRANCHISEE, this Agreement, any related agreement, the Franchise or the entity owning a controlling interest in the Franchise, but if a transfer, alone or together with other previous, simultaneous or proposed transfers, would have the effect of transferring either a controlling interest in or operating

USS Franchise Agreement 05.00                                                                         4/2008

control of FRANCHISEE, this Agreement, any related agreement, the Franchise or the entity owning a controlling interest in the Franchise, FRANCHISOR may, in its discretion, require as conditions to its consent that:

(i) Franchisee is in compliance with all terms of this Agreement.

(ii) FRANCHISEE'S debts to FRANCHISOR and others relating to the Franchise have been satisfied.

(iii) FRANCHISEE and the transferor have executed a general release, in a form satisfactory to FRANCHISOR, of any claims against FRANCHISOR and its partners, members, shareholders, officers, directors, attorneys, employees and agents, in their corporate, company, and individual capacities.

(iv) FRANCHISEE (if FRANCHISEE is the selling or transferring party) or the transferee has paid FRANCHISOR'S then-current initial training fee and then-current Transfer Fee. FRANCHISOR'S current Transfer Fee is the greater of (i) 15% of the sale price of the Franchise, or (ii) $5,000. If the Initial Franchise Fee paid by FRANCHISEE or the transferor pursuant to Section 9.1 was discounted by FRANCHISOR at the time this Agreement was executed, FRANCHISEE or transferor will also pay FRANCHISOR an amount equal to the initial discount.

(v) If any part of the sale price of any transferred interest is to be financed, the transferor will have agreed that all obligations of the transferee under any promissory notes, agreements or security interests reserved by the transferor in the assets of the transferee of the Franchise will be subordinate to the obligations of the transferee to pay the Continuing Franchise Fees required by Section 9.2 and any other amounts due to FRANCHISOR or otherwise to comply with this Agreement or the Franchise Agreement executed by the transferee.

(vi) The transferee (including any person with a beneficial interest in the transferee if it is a partnership, limited liability company, or corporation) has demonstrated to FRANCHISOR'S satisfaction that it meets the then-current standards that FRANCHISOR would normally apply to any prospective franchisee. The transferee must, for example, demonstrate that it meets FRANCHISOR'S educational, personal, managerial, and business standards; possesses a good moral character and a good business reputation; has the aptitude and ability to conduct the Franchise (as may be shown by prior related experience); has adequate financial resources and capital to operate the Franchise; is financially responsible and has a good credit rating; will be likely in FRANCHISOR'S opinion to comply with the terms of this Agreement or FRANCHISOR'S then current standard Franchise Agreement; and has no direct or indirect connection with any actual or potential competitor of FRANCHISOR or any of its Franchisees.

(vii) The transferee (including any person with a beneficial interest in the transferee if it is a partnership, limited liability company, or corporation) has entered into a written transfer agreement, in a form satisfactory to FRANCHISOR, assuming and agreeing to discharge FRANCHISEE'S and/or the transferor's obligations under this Agreement and any related agreements.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

**FRAN**data
FOR INTERNAL USE ONLY - NOT FOR RESALE

(viii) This Agreement shall be terminated and the transferee (including any person with a beneficial interest in the transferee if it is a partnership, limited liability company, or corporation) shall have executed FRANCHISOR'S then-current standard Franchise Agreement (excluding any requirement to pay an Initial Franchise Fee) and related agreements (including any guaranty agreements).

(ix) The transferee and its Manager, if any, have agreed to successfully complete (at the transferee's expense and to FRANCHISOR'S satisfaction) any sales training and testing then in effect for franchisees.

(x) FRANCHISOR has decided not to exercise its right of first refusal, if any, under Section 25.5.

(xi) FRANCHISOR has consented to the material terms and conditions of the transfer, including the price and terms of payment, which will not be so burdensome as to adversely affect the operation of the Franchise by the transferee.

(c) Except as specified below, the Transfer Fee specified in Section 25.2(b)(iv) is nonrefundable and fully earned by FRANCHISOR when paid. If, before the completion of the transferee's initial training, FRANCHISOR, in its discretion, decides that transferee should not operate a FRANCHISOR franchise business, FRANCHISOR may withdraw final approval of the transfer. If FRANCHISOR withdraws final approval of the transfer, FRANCHISOR will refund the Transfer Fee, less its out-of-pocket costs of providing the transferee's initial training, if the transferee executes a general and release and non-competition agreement containing terms reasonably satisfactory to FRANCHISOR.

(d) No transfer in the nature of a grant of a security interest in FRANCHISEE, this Agreement, any related agreement, the Franchise or the entity owning a controlling interest in the Franchise will be permitted without FRANCHISOR'S prior written consent, which consent will be at FRANCHISOR'S discretion. If FRANCHISOR consents to a transfer in the nature of a grant of a security interest, and if the holder of the security interest later seeks to exercise the rights of FRANCHISEE or assume the interest of FRANCHISEE in the Franchise, this Agreement, any related agreement, or the entity owning a controlling interest in the Franchise due to a default under any documents related to the security interest, FRANCHISOR will have the option to purchase the rights of the secured party by giving all sums then due to the secured party, and the secured party will sign an agreement to that effect before any transfer of a security interest takes place.

25.3    Transfer to FRANCHISEE'S Corporation, Limited Liability Company, or Partnership. If a proposed transfer is to a corporation, limited liability company, or partnership wholly-owned by FRANCHISEE which is formed solely for the convenience of ownership, FRANCHISOR'S consent to the transfer may, in its discretion, be conditioned on the following requirements:

(a) The corporation, limited liability company, or partnership's activities will be confined exclusively to operating the Franchise.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

(b)    FRANCHISEE will act as the corporation, limited liability company, or partnership's principal operating office, managing member, or general partner.

(c)    The Articles of Incorporation of the corporation, or the Articles or Certificate of Organization of the limited liability company or partnership will state that the transfer of any stock or interest in the corporation, limited liability company, or partnership is specifically subject to all restrictions on transfer in this Agreement; and each stock certificate of a corporation or certificate of interest of a limited liability company or partnership will have conspicuously endorsed on its face a statement in a form satisfactory to FRANCHISOR that it is held subject to and that further transfer is subject to, all restrictions on transfers in this Agreement.

(d)    All shareholders, members, or partners will jointly and severally guarantee the corporation, limited liability company, or partnership's performance and will bind themselves to the terms of this Agreement and any related agreements.

(e)    FRANCHISEE will maintain a then-current list of all shareholders, members, or partners and furnish the list to FRANCHISOR on request.

(f)    Copies of the transferee's Certificate and Articles of Incorporation, Certificate and Articles of Organization or Partnership, By-Laws, resolutions authorizing entry into this Agreement, and any other significant governing documents, will be promptly furnished to FRANCHISOR.

(g)    No shareholder, member, or partner shall have any interest or association whatsoever with any business that offers services that are the same as or substantially similar to the services that are offered by FRANCHISOR and its franchisees.

25.4    <u>Transfer and Issuance of Securities</u>.  If FRANCHISEE is a corporation, limited liability company, or partnership, it will contain prohibitions on transfer of any stock, membership or partnership interest in its Articles, Bylaws, Operation Agreement, or Partnership Agreement; and will maintain stop transfer instructions against the transfer of any stock certificate, membership or certificate of interest contrary to the terms of this Section 25, and will issue no certificate on the face of which the following statement does not legibly and conspicuously appear:

> The transfer of this [stock certificate, membership interest, or certificate of interest] is subject to the terms of a Franchise Agreement dated [ ] between United Shipping Solutions ("FRANCHISOR") and the [corporation, limited liability company, or partnership] which contains express prohibitions and/or limitations and conditions upon such transfers, as well as a Right of First Refusal in favor of the FRANCHISOR.

25.5    <u>FRANCHISOR'S Right of First Refusal</u>

(a)    Any party who holds any interest in FRANCHISEE, this Agreement, any related agreement, the Franchise or entity owning a controlling interest in the Franchise, and who desires to accept any bona fide offer to purchase that interest from a third party, within 5 days after receipt of the offer, must notify FRANCHISOR in writing of the offer and provide all available information about

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

the offer and the proposed purchaser, and except as otherwise provided in this Agreement, FRANCHISOR will have the right and option, exercisable within 30 days after receipt of the written notification, to send written notice to the proposed seller that FRANCHISOR or its nominee intends to purchase all or part of seller's interest, excluding any extraneous assets not necessary to the operation of the Franchise, on the same terms and conditions, or their cash equivalent, as offered by the proposed purchaser. If the parties cannot agree on a cash equivalent within a reasonable time, three appraisers will be designated (one by FRANCHISOR, one by FRANCHISEE, and one by the first two appraisers), and their determination will be binding. The parties will share the appraisers' fees and expenses equally. Any material change in the terms of any offer before closing will constitute a new offer subject to the same right of first refusal by FRANCHISOR or its nominee as in the case of an initial offer. If FRANCHISOR or its nominee elects to purchase, then the closing of such purchase shall occur within 40 days after the date of notice of its election to purchase or the proposed closing date in the third party's offer, whichever date is later. FRANCHISOR'S failure to exercise the right of first refusal will not be a waiver of any other term of this Agreement applicable to a proposed transfer.

(b)     If a proposed transferee is the spouse, child or parent of the proposed transferor, or is a person or entity already holding an equity interest in FRANCHISEE or the Franchise as of the date of this Agreement that has been previously disclosed to FRANCHISOR, FRANCHISOR will not have any right of first refusal as provided in Section 25.5(a), unless the proposed transferee has a direct or indirect connection with any actual or potential competitor of any FRANCHISOR franchisee. However, written notification of this type of transfer must be provided to FRANCHISOR by the transferor at least 30 days prior to consummation of that transfer.

25.6    Transfer On Death, Permanent Incapacity or Dissolution. On the death or permanent incapacity of any person owning an interest in FRANCHISEE, the Franchise, this Agreement, any related agreement, or entity owning a controlling interest in the Franchise, or on the dissolution of FRANCHISEE if it is a corporation, limited liability company, or partnership, the executor, administrator, personal representative or trustee ("personal representative") of that person or entity will transfer his, her or its interest to a third party acceptable to FRANCHISOR within 180 days after assuming that capacity. Any transfer of this type, including a transfer by devise or inheritance, will be subject to the same requirements as other transfers under this Agreement, but if the transfer is to a spouse, child or parent, the Transfer Fee required under Section 25.2 (b)(viii) will not be required. If the heirs or beneficiaries of any deceased person are unable to meet these conditions, the personal representative of that deceased person will have an additional 60 days to dispose of the deceased person's interest, which disposition will be subject to the requirements of transfers in this Agreement, including the requirements of this Section 25. If the interest is not disposed of within 180 days, or in the case of a deceased person within the additional 60 days, FRANCHISOR may terminate this Agreement, or may exercise an option to purchase the Franchise at fair market value, determined by reference to the income and asset value of the Franchise as a going concern, but the earnings multiple used to determine the going concern value will be reduced, to exclude any goodwill associated with FRANCHISEE'S use of the Marks. The going concern value, which will be determined as of the date of the transfer, will be payable in cash or cash equivalent at closing, unless otherwise agreed by the parties. If the parties fail to agree on a going concern value, three appraisers will be designated (one by FRANCHISOR, one by the decedent's estate, and one by the first two appraisers), and their determination (which if not agreed upon by the appraisers will be the average of the two closest appraisals) will be binding.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

The parties will share the appraisers' fees and expenses equally. For the purposes of this Section and Section 25.7, permanent incapacity will be defined in FRANCHISOR'S discretion.

25.7    <u>Interim Operation of Business on Death or Permanent Disability</u>. Pending transfer on the death or permanent incapacity of FRANCHISEE (or the principal operating officer, managing member, or general partner of FRANCHISEE, if it is a corporation, limited liability company, or partnership), FRANCHISOR will have the option to appoint a general manager to operate the Franchise for the account of FRANCHISEE until an approved transferee is able to assume the operation of the Franchise, for a period of up to 12 months without the consent of FRANCHISEE, the personal representative of FRANCHISEE, or FRANCHISEE'S successor in interest. All funds from the operation of the Franchise during the period of operation by the FRANCHISOR appointed general manger will be kept in a separate fund, and all expenses of the Franchise, including compensation, the management consulting fee (currently $300 per day per managers) plus costs, travel, and living expenses of the FRANCHISOR appointed general manager (the "Management Expenses" – See Section 9.13), will be charged to the fund. As compensation for the services provided, FRANCHISOR will charge the fund the full amount of the Management Expenses incurred during the period of operation by FRANCHISOR. FRANCHISOR will only have a duty to utilize reasonable efforts in operating the Franchise, and will not be liable to FRANCHISEE or its principals for any debts, losses or obligations incurred by the Franchise, or to any creditor for any equipment, inventory, products, supplies or services purchased for the Franchise during any period in which it is operated by the FRANCHISOR appointed general manager.

25.8    <u>Non-Waiver of Claims</u>. FRANCHISOR'S consent to a transfer of any interest in FRANCHISEE, this Agreement, any related agreement, the Franchise or entity owning a controlling interest in the Franchise will not be a waiver of any claims it may have against the transferring party, nor will it be a waiver of FRANCHISOR'S right to demand the transferee's compliance with the terms of this Agreement.

## 26.    DEFAULT AND TERMINATION

26.1    <u>Termination Upon Notice</u>. Except as may be prohibited by federal bankruptcy law or applicable state law, FRANCHISEE will be in default and FRANCHISOR may, in its discretion, terminate the Franchise and this Agreement, without giving FRANCHISEE any opportunity to cure the default, effective immediately on giving written notice of termination to FRANCHISEE, if:

 (a) FRANCHISEE is insolvent (is unable to pay its debts as they come due or has debts that are greater than its assets).

 (b) FRANCHISEE, without FRANCHISOR'S prior written consent, abandons the Franchise.

 (c) FRANCHISEE (or a principal officer, managing member, or general partner of FRANCHISEE, if FRANCHISEE is a corporation, limited liability company, or partnership) is convicted of a felony, a crime involving moral turpitude or consumer fraud, or any other crime that is reasonably likely, in the opinion of FRANCHISOR, to have an adverse effect on the System, the Marks, the goodwill associated with the System or the Marks, or FRANCHISOR'S interest in the System or the Marks.

 (d) The operation of the Franchise is creating a threat or danger to public health or safety.

 (e) FRANCHISEE fails, refuses or neglects to pay FRANCHISOR, any affiliated company, carrier partner, or any other vendor, any sum owing when due, or commits any other default of this Agreement within 12 months after committing any prior default for which FRANCHISOR gave FRANCHISEE written notice, whether or not FRANCHISEE later cured that prior default.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

(f)     FRANCHISEE fails, refuses or neglects to pay any income taxes or quarterly employer taxes due, or to file any income tax or employer tax form due.

(g)     FRANCHISEE knowingly makes a material false or incomplete statement or omission in any report submitted to FRANCHISOR (see also Section 13.8).

(h)     FRANCHISOR discovers that FRANCHISEE knowingly made a material false or incomplete statement or omission to FRANCHISOR to obtain the Franchise.

(i)     FRANCHISOR'S principal carrier contract(s) is/are terminated for any reason and FRANCHISOR is unable, after a good faith effort, to negotiate a contract containing substantially similar terms with another air express carrier.

(j)     FRANCHISEE files suit or makes any other formal legal claim against any FRANCHISOR approved carrier(s).

26.2    <u>Termination After Notice and 10-day Opportunity to Cure</u>.  FRANCHISEE will have 10 days, or any greater number of days expressly permitted in writing by FRANCHISOR or as required by law, to cure any default for which FRANCHISOR has given written notice of default and termination to FRANCHISEE under this Section 26.2 and to provide FRANCHISOR with evidence of the cure.  If a default is not cured within that period, or any longer period permitted by FRANCHISOR or required by law, the Franchise will terminate automatically without the need for further notice to FRANCHISEE, effective immediately on the expiration of the 10-day cure period or longer cure period permitted by FRANCHISOR or required by law.  FRANCHISOR may give written notice of termination under this Section 26.2, if:

(a)     FRANCHISEE fails, refuses or neglects to pay to FRANCHISOR, any affiliated company, carrier partner, billing and invoicing vendor, or other vendor, any sum owing when due or to accurately submit to FRANCHISOR any required information when due;

(b)     FRANCHISEE or any other person or entity purportedly transfers any interest contrary to Section 25 or an approved transfer is not effected following death, permanent incapacity or dissolution as required by Section 25.6;

(c)     FRANCHISEE participates in in-term competition contrary to Section 21;

(d)     FRANCHISEE improperly discloses any confidential information learned or received in connection with this Agreement, whether or not designated as "Confidential," contrary to Section 12 or 20;

(e)     FRANCHISEE violates the carrier Sales Guidelines Agreement for sales partners (Attachment 8) or other carrier partner policies pertaining to advertising and promotion for sales partners (Attachment 8); or

(f)     FRANCHISEE submits inaccurate names, addresses or ZIP Codes in order to acquire customer accounts outside FRANCHISEE'S Development Territory, or in order to disguise accounts that are existing carrier partner customers or another selling partner of our current carrier partner, or FRANCHISEE alters billing information in a manner that fraudulently increases charges to customers and/or fraudulently increases revenues for FRANCHISEE.

26.3    <u>Termination After Notice and 30-Day Opportunity to Cure</u>.  FRANCHISEE will have 30 days, or any greater period permitted by FRANCHISOR or required by law, to cure any default for which FRANCHISOR has given written notice of default and termination to FRANCHISEE under this Section 26.3 and to provide FRANCHISOR with evidence of the cure.  If a default is not cured within that period, the Franchise will terminate without the need for further notice to FRANCHISEE, effective immediately on the expiration of the cure period.  FRANCHISOR may

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

give written notice of termination under this Section 26.3 for any failure by FRANCHISEE to comply with any term of this Agreement. Defaults may include, for example, if:

(a) FRANCHISEE fails to maintain any standard or specification or procedure required to be maintained or followed by this Agreement;

(b) FRANCHISEE fails, refuses or neglects to obtain FRANCHISOR'S prior written acceptance, approval or consent as required by this Agreement;

(c) FRANCHISEE misuses or makes any unauthorized use of the System or the Marks or otherwise materially impairs the goodwill associated with or FRANCHISOR'S rights in the System or the Marks;

(d) FRANCHISEE fails to meet any minimum average gross shipment quota specified in Attachment 1, at any time during any 12 month period or fails to maintain records in a manner that permits an accurate determination of gross shipping volume;

(e) FRANCHISEE or its Manager fails to comply with the requirement of personal attention in Section 4;

(f) FRANCHISEE fails to maintain records in a manner that permits an accurate determination of gross shipping volume; or

(g) FRANCHISEE fails to comply with the requirements of Section 13.3 or 13.4.

26.4    Termination For Cause by FRANCHISEE. FRANCHISEE may terminate the franchise for cause, if FRANCHISOR has materially defaulted in the performance of any obligation under this Agreement, and if:

(a) FRANCHISOR has failed to cure a notice default within 30 days after the notice is given; but if FRANCHISOR will be delayed, hindered in or prevented form performance of any act required by the notice because of strike, labor trouble, inability to procure materials, restrictive governmental law or regulation, riot, insurrection, war or act of war, default of another party, or other reason beyond its control, then performance of the act will be excused for the period of delay, and the period of performance of the act will be extended for a period equivalent to the period of the delay.

26.5    Termination Not Sole Remedy.    Termination is not the sole remedy available under this Agreement and, whether or not termination is effected, all other remedies will remain available.

## 27.    OBLIGATIONS ON EXPIRATION OR TERMINATION

27.1    On expiration or termination of the Franchise, or if FRANCHISOR purchases FRANCHISEE'S Franchise pursuant to Section 25.3 or otherwise, FRANCHISEE will cease operation of the Franchise; will cease to be a UNITED SHIPPING SOLUTIONS franchisee; will immediately and permanently discontinue use of the Marks, any names containing the Marks, any confusingly similar marks or names, and any designations indicating or tending to indicate that FRANCHISEE is in any way affiliated with FRANCHISOR, and will immediately and permanently discontinue use of the System and any Confidential Information received in connection with this Agreement, whether or not designated as "Confidential."

27.2    On expiration or termination of the Franchise, or if FRANCHISOR purchases FRANCHISEE'S Franchise pursuant to Section 25.3 or otherwise:

(a) Franchise promptly must surrender to FRANCHISOR or its designee, or, if directed by FRANCHISOR, destroy and

USS Franchise Agreement 05.00                                                                4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

immediately discontinue the use of, all service marks, trademarks, trade names, trade dress, signs, structures, literature, forms and promotional materials, and all other items indicative of FRANCHISOR'S services or products, and must make or cause to be made changes in its office, if any, that FRANCHISOR may reasonably direct to effectively distinguish the office from other FRANCHISOR or Franchisee offices, all at FRANCHISEE'S expense.   FRANCHISEE also promptly must offer to FRANCHISOR, at their original purchase price, all resalable products and supplies bearing FRANCHISOR'S logos or Marks;

(b)   FRANCHISEE promptly must deliver to FRANCHISOR or its designee all Manuals, bulletins, instruction sheets, forms, devices and other written materials, and all copies of the same, received by FRANCHISEE under this Agreement.

(c)   FRANCHISEE promptly must pay all charges due for telephone services and for its Franchise-related telephone listings, must assign those telephone listings to FRANCHISOR or its designee, and must discontinue any radio, newspaper or other advertising which may in any way identify FRANCHISEE with FRANCHISOR'S services or products.

(d)   FRANCHISEE must not use, copy, disseminate or reveal to others any trade secrets, or any Confidential Information, materials, ideas, systems or procedures learned or received in connection with this Agreement, or any other manuals, bulletins, instruction sheets, forms, devices and other written materials received from FRANCHISOR.

(e)   FRANCHISEE promptly must take any action necessary to cancel any assumed name or equivalent registration that contains any Mark owned or licensed by FRANCHISOR, and submit to FRANCHISOR proof of compliance with this obligation within 30 days after repurchase, termination or expiration.

(f)   If FRANCHISEE'S interest in the Franchise expires, is terminated, or is not renewed, FRANCHISOR shall be entitled, without further notification to the FRANCHISEE, to assume ownership of all FRANCHISEE accounts and receivables.   The parties agree that FRANCHISOR will thereafter bill and collect all outstanding customer shipments.   FRANCHISEE agrees to execute all documents reasonably necessary, in whole or in part, to perfect and/or renew FRANCHISOR'S security interest in FRANCHISEE'S unpaid client shipments and in payments to carriers by FRANCHISEE, even if those documents differ from or are in addition to the UCC-1 signed under Section 24.2 of this Agreement.   FRANCHISEE further agrees to execute all documents that may reasonably be required by the jurisdiction in which FRANCHISEE'S Development Territory is located to secure, perfect and/or renew FRANCHISOR'S security interest in FRANCHISEE'S unpaid client shipments and in payments to carriers by FRANCHISEE in the future.

27.3   On expiration or termination of the Franchise other than under Section 26.4, or if FRANCHISOR purchases FRANCHISEE'S Franchise pursuant to Section 25.3 or otherwise:

(a)   FRANCHISEE immediately must permit FRANCHISOR to place its employees or independent contractors in the Development Territory or on the premises of FRANCHISEE'S commercial office (if any) for the purposes of continuing the operation of the

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

Franchise for the benefit of FRANCHISOR, the System, and facilities and customers served by FRANCHISEE.

(b) FRANCHISEE immediately must deliver to FRANCHISOR or its designee access to all hard copy and computer files, data, and materials relating to the operation of the Franchise, including client records, contracts, billing and account information, receivables, payables, vendor or supplier information, employee and independent contractor records, plans, specifications, designs, data, samples, models, services, training tapes, handbooks, drawings, records, files, invoices, sales and marketing information, instructions and correspondence, and all copies of the same, all of which FRANCHISEE acknowledges to be FRANCHISOR'S property, and must retain no copy or record of the same, except FRANCHISEE'S copy of this Agreement and copies of documents reasonably needed to comply with any applicable law.

27.4    FRANCHISEE and FRANCHISOR must make a prompt and final accounting on expiration or termination of the Franchise.  Any sums owed under, or in connection with, this Agreement, any sums related to the Franchise owed to third parties, and any other sums related to the Franchise owed for judgments or otherwise, shall be accelerated and must be paid immediately by the owing party.

## 28.    ENTIRE AGREEMENT; EXECUTION DATE; MODIFICATION

28.1    This Agreement and the related agreements, attachments, and exhibits, are the entire agreement of the parties, superseding all prior written or oral agreements of the parties concerning the same subject matter.  The terms of this Agreement are binding on the parties, and on their heirs, executors, administrators, successors and assigns.  Notwithstanding the foregoing, nothing in this Agreement is intended to disclaim the representations and disclosures contained in the FDD previously provided to FRANCHISEE by FRANCHISOR.

28.2    The execution date of this Agreement is the date it is countersigned by FRANCHISOR.

28.3    Except as otherwise specified in this Agreement, this Agreement may not be modified except in a written agreement of at least equal formality signed by the parties.

28.4    This Agreement will be deemed modified to the extent necessary to make consistent with the terms of all FRANCHISOR'S then current carrier contract(s) covering the Development Territory.

## 29.    INTERPRETATION

29.1    This Agreement's caption headings are for convenience only and should in no way affect the manner in which any term of this Agreement is interpreted.

29.2    Whenever the context requires, the singular includes the plural, the plural includes the singular, the whole includes any part, and any gender includes all other genders.

29.3    The following words have the following meanings in this Agreement and any related agreements: "discretion" means "sole discretion"; "including" means "including but not limited to; "will" means "shall"; "repeatedly" means "at least 3 times"; "current" and "currently" refer to the time of execution of this Agreement and indicate, when describing a fee, that the fee is subject to increase with a published consumer price index; and "then-current" refers to the time of the contingency or event involved.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

29.4    Whenever this Agreement gives FRANCHISOR the right to perform an act in the future, that act may be performed "from time-to-time," when FRANCHISOR chooses, in its discretion, unless stated otherwise in this Agreement.

29.5    If two or more parties sign this Agreement for FRANCHISEE or as guarantors for FRANCHISEE, their liability is joint and several.

29.6    This Agreement shall be deemed made and entered into in the State of Utah and shall be governed by the Federal Arbitration Act (9 U.S.C. 1 et seq.) and the laws of the State of Utah; but if any term of this Agreement not governed by the Federal Arbitration Act is not enforceable under the laws of the Sate of Utah, that term is governed by the laws of the state in which the largest portion of FRANCHISEE'S Development Territory is located.

29.7    Neither this Agreement nor any term or provision contained in it shall be construed against the FRANCHISOR by reason of its having been prepared by FRANCHISOR, but shall be treated in all respects as containing the terms and provisions selected by each of the parties.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANdata
FOR INTERNAL USE ONLY - NOT FOR RESALE

## 30.   PARTIAL INVALIDITY

30.1    If any Section of this Agreement is determined to be wholly invalid, that determination will not be deemed to affect the validity of any other Section. The parties agree that the remaining Sections will be deemed to be in full force and effect, as if the parties had executed them after removal of the invalid Section. If any Section or Subsection is determined to be partially invalid, the remainder of that Section or Subsection will continue to be enforceable if in accordance with the intent of the parties.

30.2    If any applicable and binding law or rule of any jurisdiction requires greater prior notice of the termination of or refusal to renew the Franchise than is required by this Agreement or the taking of some other action not required by this Agreement, or if under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by FRANCHISOR is invalid or unenforceable, the notice and/or action required by the law or rule will be substituted for the notice or action requirements or this Agreement, or the invalid or unenforceable provision, specification, standard or operating procedure will be modified to the extent required to be valid and enforceable. The modifications to this Agreement will be effective only in the jurisdiction requiring them, and this Agreement will be enforced as originally made and entered into in all other jurisdictions.

## 31.   WAIVER AND ESTOPPEL

31.1    No failure of FRANCHISOR to exercise any right reserved to it under this Agreement, or to insist on compliance by FRANCHISEE with any term of this Agreement, and no custom or practice of the parties at variance with any term of this Agreement, will constitute a waiver of FRANCHISOR'S right to demand compliance with any term of this Agreement. Waiver by FRANCHISOR of any default will not affect or impair FRANCHISOR'S rights as to any subsequent default of the same or a different nature; nor will any delay, forbearance or omission by FRANCHISOR to exercise any right as to any default of any term of this Agreement affect, impair or be a waiver by FRANCHISOR of any right as to any subsequent default.

## 32.  '  ARBITRATION; ENFORCEMENT

32.1    Except as otherwise specified in this Agreement, the parties agree that any dispute between them, or any claim by one or more of them, concerning this Agreement, any related agreements, or the Franchise that cannot be settled through negotiation or mediation, will be resolved solely and exclusively by binding arbitration initiated at and supervised by the AAA office nearest the home office of FRANCHISOR at the time, unless agreed otherwise by the parties.

32.2    Arbitration will be conducted by 1 arbitrator under the then-prevailing commercial arbitration rules of the AAA, except that each party agrees, at a minimum, to provide (if practicable, within 10 days after a written request is received from the other party) any documents reasonably requested by the other party, and to permit up to 2 witnesses under its control to be deposed by the other party at or near their place of work within a reasonable time after the witnesses are identified in writing by the other party. Arbitration will take place at the AAA office nearest the home of FRANCHISOR at the time, and will be conducted on an individual, not a class-wide, basis. No arbitration award will have any preclusionary or collateral estoppel effecting on any other arbitration or adjudicatory proceeding. Judgment on an arbitration award may be entered in any court of competent jurisdiction, and will be binding, final and non-appealable.

32.3    If any dispute or claim cannot be the subject of arbitration, the parties agree that the dispute or claim will be separated from all other disputes and claims, which other disputes and claims will first be resolved by arbitration, after which any dispute or claim which cannot be the subject of

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

arbitration will be brought before a court and resolved in accordance with the terms of this Section 32.3. If the parties are unable to separate out these matters, their allegations and positions on them will be brought before the arbitrator(s), who will rule separately on the matters, and that ruling will be subject to appropriate judicial review on the petition of a party. For all disputes and claims that cannot be the subject of arbitration, FRANCHISEE and FRANCHISOR agree that any such action will be brought in a state or federal court of general jurisdiction in the county or city in which the home office of FRANCHISOR is located at the time. FRANCHISEE irrevocably submits to the exclusive jurisdiction and venue of these courts and waives any objections it may have to the venue of these courts.

32.4   Nothing in this Section 32 will prevent FRANCHISOR from obtaining temporary, preliminary or permanent injunctive relief, without bond, from a court or agency of competent jurisdiction against actual or threatened conduct causing loss or damage that can be remedied under usual equity rules.

32.5   If any arbitration, any action for any dispute or claim which cannot be the subject of arbitration, or any action for injunctive relief is started concerning this Agreement, any related agreement, or the Franchise, the party which substantially prevails in that arbitration or action will be entitled to a judgment against the other party for the cost of the arbitration or action, including reasonable attorneys' fees, reasonable expenses of arbitration or litigation, and arbitration or court costs.

32.6   Any claim concerning the Franchise, this Agreement, or any related agreement will be barred unless arbitration or an action for a claim that cannot be subject of arbitration is commenced within 1 year from the date on which FRANCHISEE or FRANCHISOR knew or should have known, in the exercise of reasonable diligence, of the facts giving rise to the claim.

32.7   FRANCHISEE and FRANCHISOR each waives, to the fullest extent permitted by law, any right or claim for any punitive or exemplary damages against the other, and agrees that if there is a dispute with the other, each will be limited to the recovery of actual damages sustained by it. FRANCHISEE and FRANCHISOR each irrevocably waives trial by jury in any action, whether at law or equity, brought by either of them.

## 33.   NOTICES

33.1   Any notice required to be given under this Agreement will be deemed to be given when delivered: by certified, registered or other receipted mail; by fax; by receipted carrier or delivery service; by telegram; or personally. If delivery has not occurred after at least two of these methods have been used, any notice required to be give under this Agreement will be deemed to be given 3 days after being posted by first-class mail, postage prepaid.

33.2   Notices to FRANCHISOR will be sent to the address of FRANCHISOR as stated in this Agreement or to any other address FRANCHISOR may specify to FRANCHISEE in writing. Notices to FRANCHISEE will be sent to the address of the Franchise as stated in this Agreement or any other address FRANCHISEE may specify to FRANCHISOR in writing.

## 34.   ACCEPTANCE, APPROVALS AND CONSENTS

34.1   Acceptances, approvals and consents required by this Agreement will not be unreasonably withheld or delayed.

34.2   Whenever this Agreement requires the prior acceptance, approval, or consent of FRANCHISOR, FRANCHISEE will make a timely written request to FRANCHISOR for the acceptance, approval or consent, which will be obtained in writing.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

34.3   FRANCHISOR assumes no liability or obligation to FRANCHISEE by providing any acceptance, approval, consent, or suggestion to FRANCHISEE, or by delaying action on or denying any request for an acceptance, approval or consent.

34.4   If, by virtue of the community property laws of any state, FRANCHISEE's spouse is deemed to have any property interest in this Agreement, the ownership of FRANCHISEE or the Franchise, FRANCHISOR will have the right to require FRANCHISEE's spouse to consent to and join in all of the terms and conditions of the Agreement and any amendments thereto.

## 35.   ACKNOWLEDGEMENTS BY FRANCHISEE

35.1   FRANCHISEE acknowledges that:

(a)   It has conducted an independent investigation of the Franchise contemplated by this Agreement, including an independent investigation of actual and potential competition in the Development Territory. FRANCHISEE recognizes that the Franchise involves significant risks, making the success of the business largely dependent on the abilities and attention of FRANCHISEE and the carrier(s) and/or resellers with whom FRANCHISOR has contracted, but over whom FRANCHISOR has no control. FRANCHISOR expressly disclaims the making of, and FRANCHISEE acknowledges that it has not received or relied on, any representation, warranty or guarantee, express or implied, as to all actual or potential competition in the Development Territory, or as to the potential sales, profits or success of the Franchise.

(b)   In entering into this Agreement, it has not relied on any representation by FRANCHISOR, or any officer, director, shareholder, member, employee, attorney, or agent of FRANCHISOR concerning the Franchise which is contrary to the terms of this Agreement, the documents incorporated into this Agreement or attached to it, or the FDD provided to FRANCHISEE by FRANCHISOR.

(c)   It has read, carefully considered, and understood this Agreement, the FDD, and all related agreements; FRANCHISOR has fully and adequately explained the terms of each to FRANCHISEE'S satisfaction; and FRANCHISOR has accorded it ample time and opportunity to consult, and it has consulted, with existing franchisees, and with financial, legal and other advisors of its own choosing, about the potential and risks of entering into the Franchise.

(d)   Complete and detailed uniformity among FRANCHISOR'S franchisees under varying conditions may be inadvisable, impractical or impossible, and accordingly agrees that FRANCHISOR, in its discretion, may modify or vary aspects of the System as to any Franchise or group of Franchisees based on, for example, local sales potential demographics, competition, business practices or other conditions. FRANCHISEE further agrees that FRANCHISOR will have no obligation to disclose or offer the same or similar variances to FRANCHISEE. It is aware that other Franchisees may operate under different agreements and, consequently, that FRANCHISOR'S obligations and rights as to those Franchisees may differ materially in certain circumstances.

(e)   It has received an FDD, FRANCHISOR'S standard Franchise Agreement and all related agreements at least 14 calendar days before the execution of this Agreement.

(f)   It has made no payments to FRANCHISOR before the execution of this Agreement.

(g)   It understands the substantial risks involved in operating the Franchise. It will, to a large degree, be dependent on the air express carrier(s') systems, personnel, administrative requirements, practices and service levels, all of which can fluctuate dramatically and frequently. It is further understood that it is likely that the additional volume of business generated by FRANCHISOR in certain

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

areas may tax the carrier(s') systems to such an extent that capacity and the carrier(s') ability to service accounts may be adversely affected. Additionally, FRANCHISEE understands and agrees that FRANCHISOR is not liable or responsible in any way for the carrier(s') ability or inability to service any FRANCHISEE account(s) or other aspects of the carrier(s') physical or administrative operations. It also understands that FRANCHISOR may not have alternative air express carrier(s) of equivalent quality with whom FRANCHISOR can contract and may not be able to replace the air express carrier(s) contract if said contract is terminated or if said carrier(s) is/are subjected to a strike. This could render the Franchise inoperable or severely impaired.

IN WITNESS WHEREOF, the parties have set their hands and seals.

**FRANCHISEE:**             **FRANCHISEE:**             **FRANCHISEE:**

_____            _____            _____
(Print Name)               (Print Name)               (Print Name)

_____            _____            _____
(Signature)                (Signature)                (Signature)

_____            _____            _____
(Date Received)            (Date Received)            (Date Received)

_____            _____            _____
(Date Signed)              (Date Signed)              (Date Signed)


**FRANCHISOR:**

UNITED SHIPPING SOLUTIONS, LLC

By: _____

Title: _____

Date Signed: _____

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

## Attachment 1 – DEVELOPMENT TERRITORY

Subject to any exclusions specified below, FRANCHISEE'S Development Territory is defined as follows:

- SEE ATTACHMENT 1A FOR MAP AND DATA.

The following exclusions apply to FRANCHISEE'S Development Territory:

- [NONE.]

If the U.S. Postal Service alters the boundary(ies) or numbers of any assigned ZIP code(s), FRANCHISOR will reassign to FRANCHISEE the re-designated ZIP code(s) that most nearly correspond to any previously held ZIP Code(s).

Unless otherwise agreed to between FRANCHISOR and FRANCHISEE, minimum shipment requirements as outlined below will commence on _____, 2008.

## EXPEDITED SMALL PACKAGE SERVICE MINIMUM REQUIREMENTS:

During the initial term of this Agreement, FRANCHISEE must meet the following expedited small package (Air Express & Ground Delivery Service) minimum average gross shipment quotas per month, per territory, during the three-month period before the end of each of the periods indicated in the following table.

| Date | Minimum Avg Gross Shipment Quota |
|---|---|
| End of 3rd month | 100 shipments/month |
| End of 6th month | 400 shipments/month |
| End of 12th month | 1,000 shipments/month |
| End of 18th month | 1,600 shipments/month |
| End of 24th month | 2,200 shipments/month |
| End of 30th month | 2,500 shipments/month |
| End of 36th month | 2,800 shipments/month |
| End of 42nd month | 3,100 shipments/month |
| End of 48th month | 3,400 shipments/month |
| End of 54th month | 3,700 shipments/month |
| End of 60th month | 4,000 shipments/month |
| End of 66th month | 4,300 shipments/month |
| End of 72nd month | 4,600 shipments/month |

Customer accounts with shipping activity pre-dating the effective date of this Agreement are excluded in determining average gross shipment quotas per month.

For purposes of the minimum average gross shipment quotas, shipments are not cumulative from 6 month period to 6 month period.

FRANCHISOR may revise the foregoing table or require FRANCHISEE to meet higher minimum average gross shipment quotas per month, per territory, in the initial term or any renewal term, if necessary to uphold contractual changes with carrier partner(s).

Unless otherwise agreed by the parties in writing, the minimum average gross shipment quota from the 73rd month to the end of the renewal term shall be equal to the average gross shipment quota of the 72nd month.

If FRANCHISEE fails to achieve any minimum average gross shipment quota, at any time during any period described in the above table, or if FRANCHISEE fails to meet any of the minimums for any two consecutive quarters during any renewal term, FRANCHISOR, at its discretion, may (i) terminate this Agreement in accordance with Section 26.3, (ii) modify the Development Territory or eliminate any exclusive rights of FRANCHISEE, or (iii) require FRANCHISEE to enter into FRANCHISOR'S then-current Franchise Development Program (FDP) (as described in the FDD).

USS Franchise Agreement 05.00                                                                                           4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

## FREIGHT SERVICE MINIMUM REQUIREMENTS:

During the initial term of this Agreement, FRANCHISEE must meet the following minimum average gross **Freight Service** shipment (*calculation excludes Air Express Service, Ground Delivery Service "GDS" and Same Day Service*) quotas per month, per territory, during the 3-month period before the end of each period indicated in the following table.

| Date | Minimum Ave Gross Freight Shipment Quota |
|---|---|
| End of 3rd month | 30 shipment/month |
| End of 6th month | 60 shipment/month |
| End of 12th month | 120 shipment/month |
| End of 18th month | 180 shipments/month |
| End of 24th month | 240 shipments/month |
| End of 30th month | 300 shipments/month |
| End of 36th month | 360 shipments/month |
| End of 42nd month | 420 shipments/month |
| End of 48th month | 480 shipments/month |
| End of 54th month | 540 shipments/month |
| End of 60th month | 600 shipments/month |
| End of 66th month | 660 shipments/month |
| End of 72nd month | 720 shipments/month |

Customer accounts with shipping activity pre-dating the effective date of this Agreement are excluded in determining average gross shipment quotas per month.

For purposes of the minimum average gross shipment quotas, shipments are not cumulative from 6 month period to 6 month period.

FRANCHISOR may revise the foregoing table or require FRANCHISEE to meet higher minimum average gross shipment quotas per month, per territory, in the initial term or any renewal term, if necessary to uphold contractual changes with carrier partner(s).

Unless otherwise agreed by the parties in writing, the minimum average gross shipment quota from the 73rd month to the end of the renewal term shall be equal to the average gross shipment quota of the 72nd month.

If FRANCHISEE fails to achieve any minimum average gross shipment quota, at any time during any period described in the above table, or if FRANCHISEE fails to meet any of the minimums for any two consecutive quarters during any renewal term, FRANCHISOR, at its discretion, may (i) terminate this Agreement in accordance with Section 26.3, (ii) modify the Development Territory or eliminate any exclusive rights of FRANCHISEE, or (iii) require FRANCHISEE to enter into FRANCHISOR'S then-current FDP (as described in the FDD).

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006



**Attachment 1A – DEVELOPMENT TERRITORY (MAP & DATA)**

.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANdata
FOR INTERNAL USE ONLY – NOT FOR RESALE

**Attachment 2 – CORPORATION/LIMITED LIABILITY COMPANY/PARTNERSHIP INFORMATION SHEET**

Corporation/Limited Liability Company/Partnership Name: _____

State/Date of Formation: _____

Shareholder/Members/Partners:

| % Interest | Class/G or L Partner | Name |
|---|---|---|
| % Interest | Class/G or L Partner | Name |
| % Interest | Class/G or L Partner | Name |
| % Interest | Class/G or L Partner | Name |
| % Interest | Class/G or L Partner | Name |

**Documents:**

| Item(s) | Not Required | Provided to FRANCHISOR | To Be Provided to FRANCHISOR Within 30 Days |
|---|---|---|---|
| Certificate and Articles of Incorporation | | | |
| Articles of Organization (LLC) | | | |
| Certificate and Agreement Partnership | | | |
| By-Laws | | | |
| Resolution Authorizing Franchise Agreement | | | |
| Operating or Partnership Agreement | | | |
| Other: | | | |

**Conditions: FRANCHISEE must meet the following conditions before becoming a UNITED SHIPPING SOLUTIONS franchisee:**

| | Yes | No |
|---|---|---|
| The corporation, limited liability company, or partnership's activities must be confined exclusively to operating the Franchise. | | |
| [Persons Name] (or another person with FRANCHISOR'S written consent) must act as the corporation, limited liability company, or partnership's principal operating officer, managing member, or partner. | | |
| Each shareholder, member, or partner, excluding only [Name] (who has or have a 5% or less interest, must sign the Guaranty Agreement (Attachment 3) | | |
| The corporation or partnership must maintain stop transfer instructions against transfer on its records of any stock certificate or certificate interest contrary to the terms of Section 25 of the Franchise Agreement. | | |
| Each stock certificate of the corporation or certificate of interest of the partnership must include the statement specified in Section 25.4 of the Franchise Agreement. | | |
| The corporation or partnership must maintain a current list of all shareholders or partners, and must furnish the list to FRANCHISOR on request. | | |

4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

**Attachment 3 – GUARANTY AGREEMENT**

In consideration of, and as an inducement to, the execution by United Shipping Solutions, LLC, a Utah limited liability company, whose address is 6985 Union Park Center, Suite 565, Salt Lake City, Utah 84047 ("FRANCHISOR") of the Franchise Agreement between FRANCHISOR and _____ ("FRANCHISEE") executed _____ (the "Agreement") each undersigned personally and unconditionally for the term of the Franchise and thereafter as provided in the Agreement, (1) guarantees to FRANCHISOR and its successors and assigns, that FRANCHISEE will punctually pay or perform each obligation in the Agreement, and (2) agrees to be personally bound by, and personally liable for the default of, each term of the Agreement. Each of the undersigned waives:

(1) Acceptance and notice of acceptance by FRANCHISOR of these undertakings.

(2) Notice of demand for payment of any indebtedness or nonperformance of any obligation guaranteed.

(3) Protest and notice of default to any party as to any indebtedness or nonperformance of any obligation guaranteed.

(4) Any right he or she may have to require that an action be brought against FRANCHISEE or any other person as a condition of liability.

Each of the undersigned agrees that:

(1) His or her direct and immediate liability under this guaranty is joint and several.

(2) He or she will render any payment or performance required under the Agreement on demand if FRANCHISEE fails or refuses to do so punctually.

(3) His or her liability will not be contingent or conditioned on pursuit by FRANCHISOR or any remedies against FRANCHISEE or any other person.

(4) His or her liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which FRANCHISOR may grant to FRANCHISEE or any other person, including the acceptance of any partial payment or performance, or the compromise or release of any claim, non of which will in any way modify or amend this guaranty, which will be continuing and irrevocable for as long as any obligation in the Agreement remains in effect.

Each of the undersigned affixes his or her signature to this guaranty as of the same date as the date of execution of the Agreement.

| GUARANTOR | GUARANTOR | GUARANTOR |
|---|---|---|
| Name: _____ | Name: _____ | Name: _____ |
| Address: _____ | Address: _____ | Address: _____ |
| _____ | _____ | _____ |
| Date: _____ | Date: _____ | Date: _____ |

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

**Attachment 4 – TELEPHONE LISTING AGREEMENT**

THIS AGREEMENT is entered into by United Shipping Solutions, LLC, a Utah limited liability company, whose address is 6985 Union Park Center, Suite 565, Salt Lake City, Utah 84047 ("FRANCHISOR"), and _____ whose address is _____ ("FRANCHISEE").

RECITALS:

A.  FRANCHISOR is the franchisor of UNITED SHIPPING SOLUTIONS businesses and the owner of service marks, trademarks, trade names and trade dresses related to the operation of those businesses (the "Marks").

B.  FRANCHISOR and FRANCHISEE have executed a Franchise Agreement dated _____, 2008 (the "Franchise Agreement"), under which FRANCHISEE is granted a franchise (the "Franchise") involving certain rights to use the Marks in FRANCHISEE'S business telephone directory listings to promote its UNITED SHIPPING SOLUTIONS businesses; and

C.  FRANCHISEE is authorized to continue using the Marks until the Franchise is repurchased, terminated or expires.

In consideration of the recitals above and the terms below, FRANCHISOR and FRANCHISEE agree:

1.  FRANCHISEE is authorized to obtain telephone service for the Franchise.  That service is not to be used in conjunction with any other business or residential telephone service.

2.  FRANCHISEE is authorized to obtain white page, yellow page and information listings, and yellow page advertisements, under FRANCHISOR or any other Marks FRANCHISEE may be authorized to use.  No proper names or city names may be used in conjunction with the Marks and no additional listings may be used with any telephone number(s) assigned to the Franchise, without FRANCHISOR'S prior written consent.

3.  All yellow page advertisements must be approved in advance in writing by FRANCHISOR.

4.  FRANCHISEE must pay all charges for telephone service, white page, yellow page and information listings, and yellow page advertisements.

5.  On repurchase, termination or expiration of the Franchise, FRANCHISEE acknowledges that its right to the use of any service marks, trademarks, trade names and trade dresses made available by FRANCHISOR to FRANCHISEE for use under the Franchise Agreement, will immediately end, and that all telephone numbers appearing under the Marks will immediately become the property of FRANCHISOR, and irrevocably releases to FRANCHISOR all rights to and use of all telephone numbers associated with the Marks then listed.  FRANCHISEE irrevocably authorizes the telephone company, on notification by FRANCHISOR of repurchase, termination or expiration of the Franchise, to assign all of those telephone numbers to FRANCHISOR or to disconnect those telephone numbers and to transfer calls coming to those disconnected numbers to any telephone numbers issued by the telephone company to FRANCHISOR, without the need for any further document(s) from FRANCHISEE.

6.  FRANCHISEE irrevocably releases the telephone company, FRANCHISOR, and their respective successors, assigns, directors, officers, employees and agents, from liability of any kind which may result directly or indirectly from FRANCHISOR'S exercise of its rights under this Agreement or from the telephone company's cooperation with FRANCHISOR in effecting the terms of this Agreement.

The undersigned agree to the terms of this Agreement:

FRANCHISEE:                FRANCHISEE:                FRANCHISEE:

Name: _____      Name: _____      Name: _____

USS Franchise Agreement 05.00                                                     4/2008

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

FRANdata
FOR INTERNAL USE ONLY · NOT FOR RESALE

Date Received: _____   Date Received: _____   Date Received: _____

Date Signed: _____   Date Signed: _____   Date Signed: _____


FRANCHISOR:

Name: _____

Title: _____

Date Signed: _____

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

**Attachment 5 – EMPLOYEE/INDEPENDENT CONTRACTOR CONFIDENTIALITY & NONDISCLOSURE AGREEMENT**

THIS CONFIDENTIALITY & NONDISCLOSURE AGREEMENT ("Agreement") is entered into effective as of _____, 2008 (the "Effective Date") by and between _____ ("Franchise/Employer" or "Company") on behalf of United Shipping Solutions, LLC, a Utah limited liability company ("Franchisor"), and _____ ("Employee/Contractor").

1. **Covenants Not to Disclose.** Employee/Contractor acknowledges that certain methods of doing business and other elements comprising the UNITED SHIPPING SOLUTIONS system are distinctive and have been developed by Franchisor at great effort, skill, time and expense; that Employee/Contractor will have regular and continuing access to valuable trade secrets, confidential information and valuable training regarding the UNITED SHIPPING SOLUTINS system; and that Employee/Contractor recognizes his or her obligation to promote and develop the Franchise. Employee/Contractor accordingly agrees as follows:

   a. Except as required in duties performed for Company, Employee/Contractor will never, either during or after the term or engagement or employment, directly or indirectly use, disseminate or disclose to any person or entity, any trade secret or confidential information, including any client name, other client information or business methods of Franchisor or Company, and will always seek to preserve the confidentiality of those trade secrets and confidential information without the prior written consent of Franchisor and Company.

   b. Employee/Contractor will not, directly or indirectly, for himself or herself, or through, on behalf of, or in conjunction with any person or entity, divert or attempt to divert any business, accounts, customers, clients, vendors, or carriers of Company or any other franchisee of Franchisor to any competitor or other person by inducement or otherwise, without the prior written consent of Franchisor and Company.

2. **Covenants Concerning Company Property.** Employee/Contractor agrees that all records of Franchisor and Company, including records of customers and all other records relating in any manner to the Franchise, whether prepared by Employee/Contractor or otherwise coming into his or her possession, are the exclusive property of Franchisor or Company. Additionally, Employee/Contractor agrees that all files, records, documents, drawings, specifications and similar items relating to the Franchise, including all copies of those items, whether prepared by Employee/Contractor or otherwise coming into his or her possession, will not be removed by Employee/Contractor from Company's premises and will immediately be returned to Company by Employee/Contractor upon termination of his or her engagement or employment, regardless of the cause of termination.

3. **Modification.** This Agreement may be modified only with Franchisor's prior written consent, and only in a written agreement of at least equal formality signed by the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates written below.

COMPANY: _____          EMPLOYEE/CONTRACTOR:

By: _____          _____
                                                                  (Sign Here)

Its: _____          _____
                                                                  (Date)

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006



## Attachment 6 – UCC-1 FINANCING STATEMENT

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any □ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any □ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| United Shipping Solutions, LLC a Utah limited liability company | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS 6985 Union Park Center, Suite 565 | CITY Salt Lake City | STATE UT | POSTAL CODE 84047 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS   Attach Addendum   [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional]   ADDITIONAL FEE] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)    International Association of Commercial Administrators (IACA)

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006

**Attachment 7 – LETTER OF CREDIT**

**[LETTERHEAD OF FINANCIAL INSTITUTION ISSUING LETTER OF CREDIT]**

**Irrevocable Standby Letter of Credit**
**Auto-Renewable**

Opening Date for Letter of Credit: [~ date ~]

Beneficiary:      United Shipping Solutions, LLC,
                  Attention: Charles Derr, Manager
                  6985 Union Park Center, Suite 565
                  Salt Lake City, Utah 84047

Applicant:        [Name and Address of Franchisee]

Amount: $10,000

Expires: December 31, [5 years from date of Franchise Agreement] at our counters in [City and State] for presentation of documents.

We hereby open our Irrevocable Standby Letter of Credit [~ number/letter ~] in your favor at the request of and for the account of the Beneficiary, United Shipping Solutions, LLC, a Utah limited liability company, 6985 Union Park Center, Suite565 Midvale, UT 84047, in an amount of TEN THOUSAND and NO/100 DOLLARS ($10,000.00) available for payment at sight by your demand/request for payment from [~ name and address of issuing bank ~] accompanied by the following documents:

A.  An Original copy of this credit.

B.  A Copy of the commercial invoice(s).

C.  A statement purportedly signed by one of your authorized officers stating that the invoice(s) referenced above was (were) presented to [name of Franchisee] and was (were) not paid in accordance with the terms of payment or contract and remains (remain) unpaid at the time of drawing.

1.  We hereby undertake to promptly honor your sight draft(s) drawn on us upon presentation. Draft(s) drawn under this letter of credit may not be presented prior to [~ date ~], and must be presented on or before December 31, [5 years from date of Franchise Agreement]. Drafts drawn under this Credit must be marked on the face "Drawn Under [~ name of issuing bank ~] Irrevocable Standby Letter of Credit [~ number/letter ~]."

2.  Except as expressly stated herein, this undertaking is not subject to any agreement, requirement or qualification.  The obligation of [~ name of issuing bank ~] under this Letter of Credit is the individual obligation of [~ name of issuing bank ~] and is in no way contingent upon reimbursement with respect thereto or upon our ability to perfect any lien, security interest or any other reimbursement.

3.  All banking charges, including any advising bank charges are for the account of [name of Franchisee].

4.  Partial shipments and drawings are permitted.

5.  The amount of commercial invoice(s) referenced above may exceed the amount of this Letter of Credit; however, in no event may drawings under this Letter of Credit exceed the value of this Letter of Credit or 100 percent of the invoice amount.

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-383353.5 0063437-00006

6.  The Beneficiary includes any successor by operation of law or the named Beneficiary.  If a court of law appoints a successor in interest to the named Beneficiary, then the named Beneficiary includes and is limited to the court appointed domiciliary receiver (including conservator, rehabilitator or liquidator).

7.  The amount available for drawings under this letter of credit will be reduced by the amount of any payment(s) that the beneficiary receives outside this letter of credit if such payment(s) are made by [~ name of issuing bank ~] and make reference to this letter of credit [~ number/letter ~].
Our obligation under this Letter of Credit shall not be affected by any circumstance, claim, or defense, real or personal, as to the enforceability of the Franchise Agreement between United Shipping Solutions, LLC and [name of Franchisee] pursuant to which this Credit was issued; it being understood that our obligation shall be that of a primary obligor and not that of a surety, guarantor, or accommodation maker.

8.  We hereby engage with you that drafts accompanied by documents drawn under and in compliance with the terms of this Credit will be duly honored upon presentation as specified.  This Letter of Credit sets forth in full the terms of our undertaking, and such undertaking shall not in any way be modified, amended, or amplified by reference to any document, instrument, or agreement referred to herein or in which this Letter of Credit is referred to or to which this Letter of Credit relates and any such reference shall not be deemed to incorporate herein by reference any document, instrument, or agreement.

9.  We will promptly notify you of any notice received or action filed alleging the insolvency or bankruptcy of the Bank, or alleging any violations of regulatory requirements that could result in suspension or revocation of the Bank's charter or license to do business.  In the event the Bank becomes unable to fulfill our obligations under this Letter of Credit for any reason, notice shall be given immediately to you.

10.  This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits, 1993 revision, ICC Publication No. 500 ("UCP").  To the extent that applicable provisions of the UCP are not in conflict, in which case applicable provisions of the UCP shall prevail, this credit shall be governed by and construed in accordance with the laws of the United States of America and the State of Utah including the Uniform Commercial Code as in effect in the State of Utah.

[~ name of issuing bank ~]

By:_____
[~ authorized signature of issuing bank ~]

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006



**Attachment 8 – CARRIER SALES GUIDELINE AGREEMENT**

**DHL SALES GUIDELINE AGREEMENT**

**Sales Guidelines:**

As a sales partner of DHL services, all partner sales representative and/or agents are expected to adhere to the following sales guidelines in order to maintain the image and integrity of DHL

1. Conduct business in a professional and ethical manner. Representatives should present a positive, professional business image to all customers and prospects. All dealings with current and prospective customers will be conducted honestly and openly and with the highest standard of ethics.

2. Sales representatives will fairly and accurately represent themselves as an agent/employee of the sales partner and will not imply that they are from DHL.

3. Develop an understanding of DHL products and operations to accurately present information to prospects and customers. Under no circumstances should a sales partner representative over commit the services or obligations of DHL.

4. Develop a working partnership with the local DHL sales and service team located in the same geographic territory. Sales Representatives should make reasonable efforts to meet and work with the local DHL sales representatives and management prior to assuming a new territory and throughout the term of this agreement.

5. Solicit business from businesses using competing carriers. All sales personal will specifically target only businesses or companies that are using competing carriers. In the event that a sales representative comes in contact with a business that is already using DHL, the sales representative may turn the visit into a service call. Any inquiries or requests from these "service visits" should be promptly referred to the local DHL sales representative or Area Sales Manager.

6. Prospective customers must give their explicit permission to sign-up for a DHL account number with the Reseller. Under no circumstances should a list of customers be automatically or pre-enrolled for DHL account numbers without direct authorization from each of the customers.

7. Adhere to the DHL advertising, promotional and brand identity guidelines. Permission from DHL must be obtained in advance before creating or using any published material incorporating the DHL logo, or name used for mass publication or distribution.

8. Make reasonable and responsible requests for account setups, airway-bills and packaging supplies.

_____          _____
Franchise                                 Position


_____          _____
Name (print)                              Signature

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006



### Attachment 9 – CARRIER PARTNER - ADVERTISING & PROMOTION POLICY

USS Carrier Partners allow for certain advertising and promotion support for authorized Third Party Selling Partners representing Carrier services, provided the basic guidelines below are followed.  It is important to remember that use of the Carrier name or logo must be approved by the Carrier *prior* to publication.

### LOGO USAGE

The Carrier logo and/or name may be used only after <u>written permission</u> has been obtained from the Carrier.

- Logo usage must follow corporate regulations.
- The logo must comply with Carrier basic layout guidelines when used on Third Party printed materials and/or in conjunction with Third Party logos.
- Logo usage may not imply that Carrier is in any way a partner of or a part of the Third Party business or corporation.
- Third Party may not use the Carrier name or logo for decorative purposes (i.e. on the corner of each page, as a background pattern, etc.).

### PHOTOGRAPHY

- Under no circumstances may any photography that is the property of Carrier be used on Third Party printed materials or in Third Party advertising.  The photography that belongs to Carrier has been specifically purchased from photographers to support Carrier marketing efforts.
- If you wish to have photography done that incorporates Carrier packaging and/or personnel, you must receive <u>written permission</u> from Carrier prior to photo shoot <u>and</u> prior to publication.
- This policy applies immediately to any use of photography in any way associated with Carrier regardless of what you have done in the past.  Any prior photos or slides that are in your possession and have been previously used must be returned to Carrier.

### COPY

- Copy published in advertising, collateral or for any other sales and marketing use may not state or imply Carrier is in any way a partner of or a part of your business.  Copy may not imply or give the impression that the piece has been published by Carrier.
- Third Party may not state that you and Carrier offer this service, but instead must indicate that you have made special arrangements, or have an agreement with Carrier that allows you to offer Carrier service to your customers at a favorable rate.
- Third Party may not publish a rate that is lower than a published discount rate currently offered through Carrier marketing, except those offered on personal sales presentations.
- Third Party may publish rates which match Carrier published drop rates, provided it is stated that those rates apply to drop box use only, except those offered on personal sales presentations.

*Any violation of the basic guidelines outlined here may constitute a violation of your Franchise Agreement and result in the termination of that agreement. The undersigned has read, understands and agrees to abide by the terms of the United Shipping Solutions Carrier Advertising and Promotion Policy.*

FRANCHISE PERSONNEL          FRANCHISE          DATE

Confidential Document, do not copy without express written consent from United Shipping Solutions, LLC.
SaltLake-382353.5 0063437-00006